[No. 54901-4-I.   Division One.   September 25, 2006.]

TALIESEN CORPORATION, *Respondent*, v. RAZORE LAND COMPANY ET AL., *Appellants*.

108

110

*John C. Bjorkman* and *Holly A. Harris* (of *Preston Gates & Ellis, L.L.P.*), for appellants.

*Donald B. Scaramastra*; *Yemi F. Jackson* and *David H. Smith* (of *Garvey Schubert & Barer*); *Anna E. Johansson*; *Daniel W. Ferm* (of *Williams Kastner & Gibbs, P.L.L.C.*);

*Michael T. Zoretic* (of *Stanislaw Ashbaugh, L.L.P.*); *William R. Hickman* and *John W. Rankin, Jr.* (of *Reed McClure*); *Ryan G. Foltz* (of *Betts Patterson & Mines, P.S.*); and *Mark M. Myers*, for respondent.

¶1 BECKER, J. — This is an appeal from the trial of an action under the Model Toxics Control Act, chapter 70.105D RCW. The plaintiff, Taliesen Corporation, sought contribution for costs incurred in cleaning up petroleum contamination in a site being prepared for development of condominiums. With minor exceptions, we affirm the trial court's many rulings.

## FACTS

¶2 Taliesen sought contribution for over $600,000 in cleanup costs from Razore Land Company, owner of the property when leakage from an underground tank occurred; Golder Associates, Inc., an environmental consultant involved with the property during its ownership by three separate parties; and Donald B. Murphy Contractors, Inc., operator of the drill that pierced the underground storage tank. As a third party plaintiff, Razore sued Townhouse, L.L.C., and Trevor, L.L.C., another former owner of the property. After various motions for summary judgment and a lengthy bench trial, the result was a small judgment for Taliesen for cleanup costs and large awards of attorney fees for prevailing parties Taliesen, Murphy, and Townhouse. Numerous issues are raised in the various appeals and cross-appeals. All parties have filed appellate briefs.

¶3 According to unchallenged findings of fact, Razore owned the real property that is the subject of this action

between 1978 and 1995. The property is near the Convention Center in downtown Seattle. In 1986, First City, a now defunct company, began to redevelop property adjoining the north and east sides of the Razore-owned property. In 1989, First City hired Golder Associates, an environmental and geotechnical consulting firm, to design and supervise the construction of a temporary shoring wall for the foundation. First City's general contractor hired Donald B. Murphy Contractors, a geotechnical construction company, to build the wall. Golder's design called for long soil nails to be inserted at an angle into the face of the shoring wall. Because the shoring wall was just a few feet east of the Razore property, the soil nails would intrude across the border and under the Razore property.

¶4 Murphy began installing soil nails per Golder's design in January 1989. In late January, the drillers encountered evidence of petroleum contamination along the Razore property's eastern boundary. On February 15, 1989, after the drillers drilled a borehole and removed the auger, Murphy and Golder personnel found dark grey and black soil with a petroleum odor. When Golder directed the drilling to continue, Murphy drilled another borehole for one of the soil nails and pierced an underground storage tank located on the Razore property. This event caused release of an unknown quantity of petroleum. The petroleum leaked and migrated down through the soil. Golder had the remaining oil pumped from the tank a week later.

¶5 In May 1989, Razore and First City signed an agreement concerning the soil. First City agreed to pay Razore to have the soil nails removed from Razore's property, to remove "any and all of its fuel tanks that encroach Razore property," and to take responsibility for any contaminated soil resulting from leaking tanks.

¶6 In a letter to the Department of Ecology (Ecology) in August 1989, Golder estimated the leak at 100 gallons of oil and said it would be cleaned up. The letter failed to mention the petroleum contamination on the property that preexisted the tank puncture. Golder supervised the re-

moval of the tank in April 1990. Soil samples taken at that time showed levels of petroleum contamination at 120 times permissible levels. A decision was made not to excavate the contaminated soils. There is no evidence that Ecology or other involved parties were told about the decision to leave the contamination on-site.

¶7 Razore sold the property in 1995 to a group of development companies. These companies—Townhouse, L.L.C., and Trevor, L.L.C.—became third-party defendants in the present action; we shall refer to them as Townhouse. Before selling the property to Townhouse, Razore did not ask First City about any underground tanks First City might have found on the property and did not check to see whether First City had complied with its contractual obligation to clean up any contaminated soil that might have resulted from leaking tanks.

¶8 Townhouse planned to build a condominium tower on the property. Townhouse hired Golder to do various projects on the property, based in part on Golder's representation that its experience with the adjacent First City property meant it would be able to minimize surprises. One project Golder did for Townhouse in 1997 was a phase I environmental site assessment of environmental conditions. The assessment by Golder disclosed the tank leak. But it suggested the underground tank was not on the property; minimized the extent and effect of the leak; failed to disclose the lab tests showing contamination at 120 times cleanup levels; failed to disclose the presence of the contamination that preceded the spill on February 15, 1989; and failed to disclose Golder's role in handling that spill. Although Townhouse did not learn of the remaining contamination from Golder's written phase I assessment, Townhouse agent Tony Simmons did become aware of the possible liability for remaining contamination from conversations he had in 1999 with David Cotton, a Golder engineer.

¶9 Townhouse sold the former Razore property and the plans for the condominiums to Taliesen in late May 2000.

Before the sale, neither Golder nor Townhouse disclosed to Taliesen the information Cotton and Simmons had discussed about the continued presence of petroleum contamination on the property. In July 2000, Taliesen hired Golder to monitor the construction of a shoring wall.

¶10 While digging in the southeast corner of the property in August 2000, Taliesen found petroleum contaminated soils. Within a few weeks, as the excavation moved inward from the southeast corner, the noticeable sheen and smell of oil signaled the presence of large amounts of contaminated soil. Taliesen decided to continue with excavation, while paying extra for the removal and disposal of the contaminated soil.

¶11 During the excavation and cleanup, Taliesen proceeded with construction of a shoring wall. In October 2000, Golder and Taliesen representatives saw a small amount of black fluid seeping through the shoring wall on the southeastern boundary of the property. No disclosures about this fluid were made to anyone else.

¶12 On January 4, 2002, Taliesen initiated the present action by filing a complaint against Razore, alleging Razore's liability for the oil leak that occurred while Razore owned the property and seeking Razore's contribution to the cleanup costs. Razore denied liability and counterclaimed that Taliesen had failed to comply with the regulatory requirements for cleanup cost recovery. Razore brought in former owner Townhouse as a third party defendant, allegedly liable for the costs.

¶13 In late May 2002, Golder—in its capacity as environmental consultant for Taliesen—sent Ecology an "independent remedial action report," as required by regulations promulgated under the Act. In the report, Golder represented on behalf of Taliesen that the contaminated soil in the building's footprint had been cleaned up. The black fluid on the shoring wall, observed after the cleanup on the southeastern boundary of the property outside the footprint of the building, was not mentioned. In August 2002, Ecology

formally approved of the cleanup by issuing a "no further action" determination.

¶14 In 2003, Taliesen amended its complaint to add Murphy and Golder as defendants in the action under the Act. As to Golder, Taliesen also alleged negligence. Murphy and Golder denied liability, asserted the construction statute of repose, and counter-claimed against Taliesen. Murphy and Golder cross-claimed against each other and against Razore. Razore cross-claimed against Murphy.

¶15 In late 2003, when discovery was almost complete and trial was approaching, Razore discovered that some Taliesen and Golder representatives had known about the seepage observed outside the building footprint after the cleanup. Taliesen responded to this discovery by retaining Landau Associates to investigate and determine whether additional remedial action was needed. Taliesen did not, however, notify prospective buyers of its condominiums that there was any remaining contamination or potential liability associated with it.

¶16 Before trial began in January 2004, the trial court entered a number of rulings deciding motions for summary judgment. In these rulings, the court determined:

(1) The construction statute of repose did not protect Murphy and Golder.

(2) Whether Murphy was liable as an operator was an issue for trial.

(3) Razore was liable as a former owner.

(4) Golder was liable as an operator.

(5) Taliesen had incurred costs in taking remedial action to clean up the oil from the underground tank.

(6) Taliesen's cleanup was the substantial equivalent of an Ecology cleanup.

(7) First City was not the cause of the contamination.

(8) Razore's innocent purchaser defense and Golder's common law defenses were barred.

(9) Taliesen's negligence claims against Golder were dismissed.

¶17 A bench trial took place in superior court before the honorable Judge Laura Gene Middaugh from January 13 to February 26, 2004. At the end, Taliesen claimed compensable costs of about $600,000. The court ruled orally on March 2, 2004. The parties then submitted motions and briefs on the subject of attorney fees.

¶18 On August 10, 2004, the court issued written findings and conclusions. The court found that Taliesen had failed to prove all but about $68,000 of the claimed costs, largely because the soil sampling conducted by Golder and Taliesen was too limited to prove that the excavated soil was actually contaminated above cleanup levels. Liability for the $68,000 in costs was allocated to Razore (5 percent); Golder (50 percent) and Taliesen (45 percent). Golder and Taliesen were ordered to share 50/50 any future remediation costs.

¶19 The court's decision to assign 45 percent of the liability for cleanup costs to Taliesen was based primarily on the court's assessment that Taliesen itself incurred liability as the current owner of the property by failing to disclose the possibility of further contamination associated with the oozing black fluid seen after the cleanup. On August 2, 2004, Taliesen filed a motion to reopen the case, hoping to show that its failure to disclose the oozing black fluid should not be weighed so heavily and that its share of liability should consequently be reduced. The court denied this motion.

¶20 Murphy, found at trial not to have liability as an operator, prevailed against Taliesen, Razore, and Golder and was awarded a total of almost $300,000 in attorney fees. Taliesen, also designated a prevailing party, was awarded more than $600,000 in attorney fees from Razore and Golder. Because Taliesen's share of Murphy's attorney fees was $95,000, Taliesen's net award of attorney fees was just over $500,000. Townhouse prevailed against Razore

and received an award of more than $200,000 in attorney fees.

¶21 Razore, though liable for only $3,400 in remediation costs, was held liable to pay some $537,000 in attorney fees to Taliesen, Murphy, and Townhouse. Golder, liable for about $34,000 in remediation costs, was held liable to pay over $500,000 in attorney fees to Taliesen and Murphy.

¶22 Razore was the first party to file an appeal, followed by Taliesen, Murphy, and Golder.

## EFFECTIVENESS OF CLEANUP

¶23 Razore assigns error to the determination that Taliesen's cleanup was the substantial equivalent of a cleanup conducted by Ecology. Razore had hoped to demonstrate at trial that Taliesen's cleanup was incompetent and, as a result, that Taliesen was not entitled to contribution.

■ ¶24 The Act provides that a person who incurs costs in cleaning up a hazardous waste site may bring a claim against certain statutorily-defined persons to recover these costs. RCW 70.105D.080. A cleanup, or "remedial action," means any action "to identify, eliminate, or minimize any threat or potential threat posed by hazardous substances to human health or the environment." RCW 70.105D.020(21). "Recovery of remedial action costs shall be limited to those remedial actions that, when evaluated as a whole, are the substantial equivalent" of a cleanup conducted by or supervised by Ecology, as determined by referring to rules adopted by Ecology. RCW 70.105D.080. These rules are found in chapter 173-340 WAC.

¶25 The trial court—through the honorable Judge James A. Doerty—granted Taliesen's motion for partial summary judgment and declared that the cleanup Taliesen conducted on the property was the substantial equivalent of an Ecology conducted cleanup. Judge Middaugh's findings and conclusions listed and reaffirmed this conclusion along with other dispositive rulings on the pretrial motions for summary judgment.

¶26 Razore assigns error to Judge Middaugh's finding as well as to Judge Doerty's ruling on summary judgment. In this case, the legal issue was decided on summary judgment before trial. No one asked Judge Middaugh to reexamine Judge Doerty's conclusion, and the record does not suggest that she did. She simply listed it along with other issues decided pretrial on summary judgment. The decision before us on review is Judge Doerty's, and we therefore take into consideration only those materials and arguments submitted to Judge Doerty.

¶27 Ecology considers an independent cleanup to be a "substantial equivalent" if it includes five elements listed in WAC 173-340-545(2)(c). These elements are: reporting the action to Ecology, Ecology not objecting to the action being conducted, taking reasonable steps to provide advance public notice, conducting the cleanup substantially in accordance with certain technical standards, and documenting that the hazardous substances are lawfully disposed of. Razore contends the court's conclusion must be reversed because Taliesen's cleanup satisfied few, if any, of Ecology's indicia of a substantially equivalent cleanup.

¶28 We agree with Razore that the August 2002 "no further action" letter from Ecology was not a talisman allowing the court to conclude that the cleanup complied with the five elements listed in the regulation. Indeed, it is undisputed that Taliesen's cleanup—conducted in the midst of a building project—emphasized speed at the expense of process. Taliesen did not thoroughly assess the extent of the contamination before disposing of soil. Taliesen did not make a prompt disclosure to the Department of Public Health, the city, potentially liable parties, or the public in general and in fact took 18 months (rather than the 90 days mentioned in the regulations) to report the cleanup to Ecology. Taliesen did not evaluate appropriate cleanup alternatives and, as a consequence, selected a method that was unnecessarily expensive. The cleanup plan adopted by Taliesen did not allow for public comment.

¶29 But the fact that Taliesen's cleanup did not satisfy the five elements listed in WAC 173-340-545(2)(c) does not mean that it was not substantially equivalent to a cleanup conducted by Ecology. What Razore's argument overlooks is that Ecology offers its regulations as "guidance" to private parties, not as absolute requirements. Substantial equivalence is determined by looking at the cleanup's "overall effectiveness":

> The purpose of this section is to facilitate private rights of action and minimize department staff involvement in these actions by providing guidance to potentially liable persons and the court on what remedial actions the department would consider the substantial equivalent of a department-conducted or department-supervised remedial action. In determining substantial equivalence, the department anticipates the requirements in this section will be evaluated as a whole and that a claim would not be disallowed due to omissions that do not diminish the overall effectiveness of the remedial action.

WAC 173-340-545(1).

¶30 Razore relies on two opinions to argue that Taliesen did not conduct a substantially equivalent cleanup. In the first case, a jury found Exxon liable under the Act for contaminated groundwater beneath Dash Point's shopping center. *Dash Point Vill. Assocs. v. Exxon Corp.*, 86 Wn. App. 596, 937 P.2d 1148 (1997). The trial court allocated cleanup costs to Exxon but did not explicitly determine Dash Point's cleanup was substantially equivalent. *Dash Point*, 86 Wn. App. at 602. This court rejected Exxon's claim that the omission required reversal because substantial equivalence "is a legal conclusion, which is a matter for the court to resolve." *Dash Point*, 86 Wn. App. at 603. Because it was undeniable on the record in that case that Dash Point had followed all applicable guidelines for cleanup, this court could conclude as a matter of law that the costs incurred by Dash Point were recoverable. *Dash Point*, 86 Wn. App. at 604-07.

¶31 Razore correctly points out that this court found substantial equivalence in *Dash Point* because there was

strict compliance with regulatory requirements. It does not follow, however, that a trial court determination of substantial equivalence will be affirmed only if there is strict compliance. The trial judge "is the actor who 'evaluate[s] as a whole' the remedial actions. This is the only reasonable interpretation of the statute in view of the fact that a MTCA [Model Toxics Control Act, chapter 70.105D RCW] contribution action involves equitable questions." *Dash Point,* 86 Wn. App. at 603 (quoting RCW 70.105D.080).

■ ¶32 The second case cited by Razore holds that a party who cleans up a site without strictly complying with federal cleanup regulations cannot recover cleanup costs under the federal counterpart to the Act. *Wash. State Dep't of Transp. v. Wash. Natural Gas Co.,* 59 F.3d 793 (9th Cir. 1995) (*WSDOT*). The Washington State Department of Transportation sued under the federal act to recover the costs of cleaning up contaminated soil encountered while building the connector between downtown Tacoma and Schuster Parkway but was denied recovery because of its failure to comply with the national contingency plan. *WSDOT,* 59 F.3d at 796.

¶33 *WSDOT* is not a controlling precedent because of the different legal standard under federal law. Whereas this state's Act calls for evaluation of the overall effectiveness of the remedial action, the national contingency plan sets forth a detailed process for showing that a party's cleanup costs are "not inconsistent" with the plan. In *WSDOT,* the failure to comply with the national contingency plan was fatal to cost recovery. Taliesen's failure to substantially follow the Washington Act's cleanup rules does not necessarily lead to the same result here, where the law directed the trial court to evaluate the cleanup in terms of its overall effectiveness rather than looking for substantial compliance with requirements in a checklist. *Cf.* 40 C.F.R. § 300.700(c)(3)(i): an action is " 'consistent with the NCP [National Contigency Plan]' if the action, when evaluated as a whole is in substantial compliance with the applicable requirements . . . and results in a CERCLA-quality [Com-

prehensive Environmental Response, Compensation, and Liability Act of 1980] cleanup." 42 U.S. §§ 9601-9675.

¶34 The court's determination of substantial equivalence is supported by the fact that Taliesen removed all the soil from the building site that had any detectable levels of contamination. Taliesen's decision to dispose of soils with contamination at levels above 25 parts per million, instead of at the Act's level of 200 parts per million, ensured that the cleanup was effective with respect to protection of human health and the environment even if it was not cost effective.

¶35 Razore contends that even if the cleanup of the soil *inside* the building footprint was effective from an environmental protection standpoint, evidence of contamination *outside* the footprint that was neither disclosed nor cleaned up means that the claim should have been disallowed. Judge Doerty denied a motion for reconsideration based on this argument on December 15, 2003. In depositions that were still being taken when the motion was first heard, Razore elicited testimony that Taliesen's cleanup was limited to the excavated building site and after it was thought to be complete in October 2000, Golder representatives witnessed a black material that smelled like petroleum oozing out of the boards that shored the walls of the excavation. There was evidence that Taliesen knew of this seepage but did nothing about it. Taliesen, however, responded with testimony from Golder engineers and other experts that further excavation outside the building footprint would have been prohibitively expensive and would have destabilized the neighboring property. Razore did not rebut this testimony. We conclude that the evidence of the seepage in the shoring wall is insufficient to warrant overturning Judge Doerty's ruling that the cleanup, because of its overall effectiveness, was substantially equivalent to an Ecology cleanup.

¶36 A federal case cited by Razore follows *WSDOT* in affirming a trial court's conclusion that a company was not entitled to contribution for remediation costs because the

cleanup was not consistent with the national contingency plan. *Pub. Serv. Co. of Colo. v. Gates Rubber Co.*, 175 F.3d 1177 (10th Cir. 1999). The case makes the point that "the NCP's regulatory framework remains EPA's [Environmental Protection Agency] main leverage in assuring the quality and consistency of private party response actions when surrounding communities and the environment are put at risk." *Gates Rubber*, 175 F.3d at 1182-83.

¶37 Ecology's leverage under the state Act is weaker because a cleanup can be judged to be "substantially equivalent" by looking at its overall effectiveness rather than by demanding compliance with specific regulations. Arguably, requiring substantial compliance with each regulation would not only improve the State's leverage but also make the results of litigation under the Act more predictable. Had that been the law governing this case, the trial court would have ruled on summary judgment that Taliesen's cleanup was not substantially equivalent, Taliesen would have had no right to recover from other parties, and what turned out to be an extremely costly and unproductive trial would have been avoided. But this policy choice is not ours to make. There may be important differences between federal and state cleanup projects that explain why Ecology chose to emphasize overall effectiveness rather than a checklist. Because Razore has not shown that Taliesen's omissions diminished the overall effectiveness of the cleanup, the trial court's legal conclusion on substantial equivalence is affirmed.

## CONSTRUCTION STATUTE OF REPOSE

¶38 In connection with summary judgment motions by Golder and Murphy, the trial court ruled that the construction statute of repose does not bar claims under the Act.

¶39 Under the statute of repose, any claim arising from construction on real property is barred that "has not accrued within six years after such substantial completion of construction, or within six years after such termination

of services, whichever is later." RCW 4.16.310. Under the Act, a private action for contribution "may be brought after remedial action costs are incurred but must be brought within three years from the date remedial action confirms cleanup standards are met or within one year of May 12, 1993, whichever is later. . . . This section applies to all causes of action regardless of when the cause of action may have arisen." RCW 70.105D.080.

¶40 These two provisions are in conflict. Contrary to Murphy's argument, it is not possible to reconcile or harmonize these two conflicting provisions without distorting the language used. Consequently, we look to the legislative statement that the Act should govern in the event of a conflict with another statute:

> The provisions of this act are to be liberally construed to effectuate the policies and purposes of this act. In the event of conflict between the provisions of this act and any other act, the provisions of this act shall govern.

RCW 70.105D.910.

¶41 Because the Act's provision is intended to govern in the event of conflict with another act, the trial court correctly declined to apply the construction statute of repose to bar the claims against Murphy and Golder.

## "CONTROL" BY OPERATOR

¶42 Under the Act, any person who "operated the facility at the time of disposal or release of the hazardous substances" is liable for cleanup costs under the Act. RCW 70.105D.040(1)(b). The trial court denied cross-motions for summary judgment on the issue of whether Murphy had liability as an operator. That issue went to trial, and Murphy prevailed. Taliesen, Golder, and Razore challenge the findings and conclusions by which the trial court determined Murphy was not an operator and had no liability.

¶43 Murphy was hired by First City to build the shoring wall for development of the property next to Razore's in

1989. Following Golder's design plans, Murphy began installing soil nails in January 1989. Soon, workers encountered petroleum contaminated soils near the border with Razore's property. On February 15, Murphy began installing soil nails just below the contaminated area. Murphy drilled one borehole and found dark gray and black soil with a petroleum odor. Golder did not halt the operation. Following the plans, Murphy drilled the next borehole. This operation punctured the underground storage tank and caused a release of petroleum into the environment.

¶44 The Act defines "operator" as any person "who exercises any control over the facility." RCW 70.105D.020-(12)(a). A "facility" includes "any building, structure, installation, equipment, pipe or pipeline." RCW 70.105D.020(4).

¶45 The trial court found "DBM [Murphy] had control and discretion over construction aspects of its work on the Project relating to how to drill and where to place the soil nails within the allowable design tolerance, but did not have authority to make design decisions such as modifying the location or number of soil nails." Finding of Fact 18. The trial court also found that Murphy did not have authority to stop the soil nailing work to investigate the possible release of petroleum and to redesign the plan; only Golder had that authority.

¶46 Taliesen, Golder, and Razore assign error to these findings. We review them to determine if they are supported by substantial evidence in the record. *Scott v. Trans-System, Inc.*, 148 Wn.2d 701, 707-08, 64 P.3d 1 (2003). Evidence in the record shows that Golder, and only Golder, had authority to and did make decisions about where to drill, even after the drillers encountered evidence of leaking petroleum. When the tank ruptured, Golder was solely responsible for formulating a response. For example, the field notes kept by Golder employee Jim Porterfield on the day of the tank puncture show that he was supervising Murphy's drilling; that he directed Murphy to stop drilling;

and that it was he who decided to leave the hole open for further assessment.

¶47 Razore and Taliesen argue that Murphy could have exercised professional responsibility and refused to follow Golder's directions once Murphy personnel saw they were being asked to operate in an unsafe manner. But the record does not compel a finding that Murphy had such an obligation based on its contract or what was known at the time. We conclude the challenged findings are supported by substantial evidence.

¶48 The trial court, following cases that interpret operator liability under the federal act, concluded that the key to operator liability was the authority to exercise control over disposal of the hazardous waste:

> To determine whether a party is an operator, the courts do not consider the extent of involvement, but whether the disposal or release occurred during that involvement and whether the party disposing of the hazardous waste had authority to determine whether and how the hazardous waste should be handled. To be an operator, the party must have authority to exercise control over the facility.

Conclusion of Law 16. The court concluded that Murphy "did not have the authority to relocate or omit soil nails or otherwise modify the engineering design of the soil nail wall" and thus "did not exercise direct authority that would have affected the hazardous waste." Conclusion of Law 18.

¶49 The Act imposes liability on any person who has "any control" over a facility. RCW 70.105D.020(12)(a). Golder and Razore propose that the legislature's use of the word "any" shows an intent for a broader sweep of operator liability under the state Act than under the federal act. Razore argues that since Murphy obviously had physical control over the drilling equipment, Murphy fits within the statutory definition of having "any control" over a facility.

¶50 The determination of whether particular statutory language applies to a factual situation is a conclusion of law, reviewed de novo. *Better Fin. Solutions, Inc. v. Caicos*

*Corp.*, 117 Wn. App. 899, 908, 73 P.3d 424 (2003). This court reviews de novo the trial court's application of the phrase "any control over the facility."

¶51 Because our Act was heavily patterned after its federal counterpart, federal cases interpreting similar "owner or operator" language in the federal act are persuasive authority in determining operator liability. *Unigard Ins. Co. v. Leven*, 97 Wn. App. 417, 428, 983 P.2d 1155 (1999). The federal standard focuses on participation in, and the exercise of control over, the operations of a facility:

> "The weight of authority strongly favors application of the actual-participation/exercise of control standard." With few exceptions, courts have been unwilling to impose CERCLA liability upon a non-owner of the property if the party did not participate in, or actually exercise control over, the operations of the facility.

*Unigard*, 97 Wn. App. at 428-29 (footnote omitted) (quoting *Levin Metals Corp. v. Parr-Richmond Terminal Co.*, 781 F. Supp. 1454, 1456 (N.D. Cal. 1991)).

¶52 Two federal cases show that operator liability under the federal act depends upon authority to control decisions about how to dispose of waste, not mere physical control over the instrumentality that causes disposal or release. The cases both involved contractors who physically disturbed contaminated soil, but their liability depended on whether they had meaningful authority to make their own decisions or were merely following directions. In one case, an excavator was alleged to have carelessly spread contaminated soils from an old dumpsite across the property. If true, these facts would make him liable as an "operator" because he "had authority to control the cause of the contamination at the time the hazardous substances were released into the environment." *Kaiser Aluminum & Chem. Corp. v. Catellus Dev. Corp.*, 976 F.2d 1338, 1340-41 (9th Cir. 1992). In the other case, an excavator whose blasting and piling work caused substantial contamination was excused from operator liability because the test under the federal Act is "the 'authority to control' the cause of the

contamination." *Interstate Power Co. v. Kan. City Power & Light Co.*, 909 F. Supp. 1284, 1288 (N.D. Iowa 1994). The court found it undisputed that all of the excavator's actions "were taken at the direction of other parties" and granted him summary judgment on the claim. *Interstate Power*, 909 F. Supp. at 1289.

¶53 Consistent with these two cases is the analysis in *United States v. Bestfoods*, 524 U.S. 51, 66, 118 S. Ct. 1876, 141 L. Ed. 2d 43 (1998), in which the Court concluded that a parent company's involvement with its subsidiary could be construed as direct parental operation when there was sufficient managerial involvement. To define actions sufficient to incur liability, the Court compared the mechanical to the organizational meaning of "operate":

> In a mechanical sense, to "operate" ordinarily means "[t]o control the functioning of; run: operate a sewing machine." And in the organizational sense more obviously intended by CERCLA, the word ordinarily means "[t]o conduct the affairs of; manage: operate a business." So, under CERCLA, an operator is simply someone who directs the workings of, manages, or conducts the affairs of a facility. To sharpen the definition for purposes of CERCLA's concern with environmental contamination, an operator must manage, direct, or conduct operations specifically related to pollution, that is, operations having to do with the leakage or disposal of hazardous waste, or decisions about compliance with environmental regulations.

*Bestfoods*, 524 U.S. at 66-67 (emphasis omitted) (alterations in original) (citations omitted) (quoting AMERICAN HERITAGE DICTIONARY 1268 (3d ed. 1992)).

¶54 The persuasive authority of the federal cases demonstrates that the key word in our state statute is "control," not "any." Murphy did not have authority to decide where to drill and merely followed Golder's directions. Although Murphy had mechanical control over the drilling facility, it cannot be said that Murphy had "any *control*" in the decision-making sense intended by the Act. The trial court properly concluded that Murphy did not have operator liability.

## ALLEGATIONS OF NEGLIGENCE

¶55 Taliesen claims that Golder committed negligent misrepresentation when Golder, at the request of Townhouse, gave Taliesen part of the misleading 1997 phase I report in May 2000 without disclosing what it knew about the contamination on the property. Golder obtained summary judgment dismissal of Taliesen's tort claims (professional negligence and negligent misrepresentation) as barred by suit limitation clauses in the July and October 2000 written contracts between Taliesen and Golder, and as having no merit in any event.

¶56 Taliesen contends that Golder's misrepresentation of conditions on the property voided the suit limitation clauses and established the tort claims as a matter of law. In reviewing this argument, under RAP 9.12 we consider only evidence that was before the court at the summary judgment phase and disregard Taliesen's citations to evidence presented at trial.

¶57 Taliesen agreed contractually that any claims it had against Golder would have to be filed within one year after Golder completed work under the contracts:

CLIENT and GOLDER agree that all claims and legal actions arising directly or indirectly from this Agreement or the Services of GOLDER shall be filed no later than one (1) year from the date of GOLDER's substantial completion of the Services or prior to the last date allowed in the applicable statute of limitation, whichever occurs first in time.

The clauses are not exculpatory releases from liability, as is true in the cases cited by Taliesen. They are limitations on the right to sue. Taliesen has not cited authority demonstrating any basis for declaring them void.

¶58 Furthermore, to sustain a claim of negligent misrepresentation, a plaintiff must establish that the defendant had a duty to disclose information on which the plaintiff would have justifiably relied. *Richland Sch. Dist. v. Mabton Sch. Dist.*, 111 Wn. App. 377, 385, 45 P.3d 580

(2002) (citing RESTATEMENT (SECOND) OF TORTS §§ 551-552 (1977)). Even if Taliesen's tort claim against Golder had been timely brought, it would fail because, at the time of the alleged misrepresentation in May 2000, Golder did not have a relationship to Taliesen that would give rise to a duty to disclose.

¶59 The trial court correctly concluded that the suit limitation clauses are not void and, even if they were, Taliesen did not submit sufficient evidence to support its tort claims.

## COST OF DISPOSAL

¶60 Taliesen asked to be compensated at the rate of $60 per ton for removing and disposing of the contaminated soils. The trial court found that price unreasonable and used a rate of $23 per ton in calculating the cost of cleanup. Finding of Fact 82. Taliesen assigns error to this finding as unsupported by substantial evidence.

■ ¶61 Finding of fact 81 sets forth the background of the rate dispute. Because Taliesen does not assign error to Finding of fact 81, it is a verity on appeal:

> In 2000, as part of its construction costs, Taliesen contracted with City Transfer, Inc. ("CTI") to excavate the Property. CTI agreed to excavate, load, haul, and dispose of all the excavated soil for the Taliesen construction project for a fixed price of $952,900. The contract anticipated the removal of roughly 49,000 cubic yards, or 73,500 tons, of dirt. This translated to a unit price of $12.96 per ton. If contaminated soil was discovered, Taliesen agreed to pay CTI an additional $60 per ton. Under this pricing scheme in the contract, however, the $60.00 per ton also included excavation, loading and hauling as well as disposal. Thus for contaminated soil, Taliesen was paying twice for the same services. Taliesen did not attempt to negotiate the price for removal and disposal of contaminated soil nor did it obtain any information as to the reasonableness of the $60.00 per ton price that would be charged by CTI under the contract.

¶62 The overall unit price of $12.96 per ton was quoted to Taliesen by CTI in June 2000. In August 2000, the

contamination was discovered. After some initial laboratory analysis in August 2000 and continuing until October 11, 2000, Taliesen authorized construction personnel to treat all soil that had any petroleum odor or discoloration as contaminated, without conducting sampling or lab analysis. In November 2000, CTI established its rate of $60.00 per ton for getting rid of soil identified as contaminated.

¶63 The contaminated soil on the construction site turned out to be much greater in volume than Taliesen anticipated when contracting for the rate of $60 per ton. At trial, Taliesen claimed $60 per ton for the cost of removing and disposing of 7,960 tons of contaminated soil from the construction site. At a total of $477,600, this was the largest item in the total of $547,998 claimed by Taliesen in its trial brief as documented cleanup costs for which contribution was sought.

¶64 Razore and Golder argued that $60 per ton was an unreasonably high price and Taliesen should not be allowed to pass it on to the other defendants. Razore presented testimony through Larry Baker and Daniel McCarthy that market rates for disposing of contaminated soil in 2000 ranged from $24 to $30 per ton.

¶65 The trial court addressed the issue in challenged finding of fact 82:

> Based on the figures referenced in Taliesen's contract with CTI and the testimony of Misters McCarthy and Baker, however, the Court finds $60.00 per ton to be an unreasonable price and finds $23 per ton to be a reasonable price for removal and disposal of the contaminated soil.

¶66 Reviewing this finding against the CTI contract figures set forth in finding 81, we understand the trial court's reasoning as follows: Taliesen had already agreed to pay $13 per ton to get rid of all excavated soils—excavation, loading, hauling, and disposal. Since this would be a normal cost of development under any circumstances, the only cost that the contributing defendants should have to bear was the difference between the base rate of $13 for all soils and

a reasonable rate for contaminated soils. The testimony of McCarthy and Baker established a floor of $24 to $30 as the market rate for contaminated soils. If the trial court had accepted their testimony as establishing a reasonable rate under the circumstances, the trial court would have calculated Taliesen's reimbursable cost within the range of $11 to $17 per ton. The trial court's oral ruling shows that the court was inclined to increase this rate slightly in recognition of "the situation as a whole." Taliesen negotiated the rates before it had any reason to anticipate what a large amount of soil would need to be disposed of as contaminated:

> my concern was they contracted to dispose of all of this soil, and then on top of that they added $60 to dispose of the contaminated soil, but they already were going to dispose of the soil. And there was no adjustment in the contract price for the fact, I believe, that they were double dipping. So I took the difference between the two and I'm coming up with $23.00 a ton for the reasonable costs for contaminated soil. I recognize that there was testimony that contaminated soil could have been disposed of at a much lower rate in varying circumstances, however, we have to take a look at the situation as a whole. And Taliesen did not anticipate that there would be any contaminated soil. Their belief was reasonable under the circumstances, and they were not obligated to search around for contractors who would dispose of contaminated soil on a wholesale value at a smaller rate because they didn't anticipate that would happen. So I used $23.00 a ton for the costs of disposing of contaminated soil.[1]

¶67 The figure of $23 per ton is not the product of a precise mathematical calculation, but rather a rough estimate the trial court arrived at after deciding that the Baker/McCarthy range was too low and the CTI charges too high.

¶68 Taliesen takes the view that the disposal cost as testified to by McCarthy and Baker were for the landfill's disposal fee only and did not include other components of

---

[1] Report of Proceedings (Mar. 25, 2004) at 21-22 (Ct.'s Oral Ruling).

dealing with contaminated wastes that were included in CTI's $60 per ton cost: segregation of soils, transportation, and additional overhead. However, this interpretation is undercut by McCarthy's testimony that the other landfills charged a tripping fee and did not require segregation of soils.

¶69 We conclude that the $23 per ton cost used by the trial court for disposal of contaminated soils was within the range of the evidence. Finding of fact 82 will not be disturbed.

## ESTOPPEL

¶70 Taliesen sought contribution for cleaning up 7,960 tons of contaminated soil. The trial court determined that Taliesen could recover costs only for soil contaminated at or above the Act's cleanup level:

> Taliesen made a business decision to use a cleanup standard that was more stringent than the standard under MTCA and did testing of the contamination level of the soil at a frequency below the MTCA recommendations. In addition, Taliesen failed to give the other potentially liable parties notice of its remedial action as required by MTCA, which would have allowed other potential responsible parties to do their own or additional testing and/or address disposal issues at a cost that was more reasonable than that contracted for by Taliesen. Taliesen, now, cannot ask the other liable parties to pay for its past business decisions.

Finding of Fact 83. The court found sufficient evidence to support only 2,036 tons of exported soil that were "above cleanup levels." Finding of Fact 84.

¶71 On appeal, Taliesen assigns error to finding of fact 84, with its limitation to only 2,036 tons. Taliesen attributes this error to the trial court's refusal to estop Golder from challenging the costs of cleanup and contends Golder should have to pay its allocated share for the entire 7,960 tons of contaminated soil.

¶72 Estoppel, an affirmative defense, must be specifically pleaded. CR 8(c). Taliesen did not plead estoppel in its reply to Golder. In general, if such defenses are not affirmatively pleaded, asserted with a motion under CR 12(b), or tried by the express or implied consent of the parties, such defenses are deemed to have been waived and may not thereafter be considered as triable issues in the case. *DeYoung v. Cenex Ltd.*, 100 Wn. App. 885, 896, 1 P.3d 587 (2000).

¶73 Taliesen refers to only one instance in the record to show that it raised estoppel against Golder: a footnote to its motion to reopen the case, filed August 2, 2004. The footnote claims that Taliesen raised estoppel against Golder "during oral argument" in response to an earlier inquiry by the trial court. Taliesen did not, however, include a transcript of the oral argument in the record. Being without an adequate record for review and doubtful in any event that such an isolated reference would avoid waiver of the defense when there is unchallenged evidence that Taliesen made its own business decision not to take time for testing, we reject Taliesen's estoppel argument.

## DISPOSAL BY SALE THEORY

¶74 Townhouse was the owner of the property in the time period between Razore and Taliesen. Razore brought Townhouse into the litigation through a third party complaint, under a provision in the Act that imposes liability upon former owners:

(1) Except as provided in subsection (3) of this section, the following persons are liable with respect to a facility:

. . . .

(b) Any person who owned or operated the facility at the time of disposal or release of the hazardous substances.

RCW 70.105D.040(1)(b).

¶75 Townhouse moved to dismiss at the end of Razore's case, claiming to be an innocent purchaser, a defense that is

set forth in RCW 70.105D.040(3)(b). Townhouse argued it was innocent because it had nothing to do with the puncture of the tank and in the 1995 transaction by which Townhouse acquired the property from Razore, Razore had assumed all liability for "claims arising out of acts prior to closing." Razore responded by pointing out evidence that Townhouse's agent Tony Simmons knew about the contamination yet Townhouse did not clean it up or disclose it to Taliesen. Razore argued that sale of a property known to be contaminated incurs liability for disposal of a hazardous substance. The trial court denied the motion to dismiss.

¶76 At the end of the trial, the court found that in view of the knowledge possessed by Townhouse agent Simmons, Townhouse could not take advantage of the "innocent purchaser" defense. The defense is not available to any person "who had actual knowledge of the release or threatened release of a hazardous substance when the person owned the real property and who subsequently transferred ownership of the property without first disclosing such knowledge to the transferee." RCW 70.105D.040(3)(b)(ii). But the court nevertheless excused Townhouse from liability because it did not fit the definition of owner liability: "Any person who owned or operated the facility *at the time of disposal or release* of the hazardous substances." RCW 70.105D.040(1)(b) (emphasis added).

> There is no indication that there was a hazardous substance released on the Property during the time it was owned by Trevor/Townhouse. Although the contamination more probably than not continued to migrate during Trevor/Townhouse's ownership, mere passive migration of hazardous substances is not a "release" within the meaning of the MTCA.

Conclusion of Law 13.

¶77 Razore contends the trial court erred in focusing solely on the fact that passive migration is not a "release" because, under a different subsection, the Act imposes liability for *disposal* of hazardous wastes:

> (1) Except as provided in subsection (3) of this section, the following persons are liable with respect to a facility:

. . . .

(c) Any person who owned or possessed a hazardous substance and who by contract, agreement, or otherwise arranged for disposal or treatment of the hazardous substance at the facility, or arranged with a transporter for transport for disposal or treatment of the hazardous substances at the facility, or otherwise generated hazardous wastes disposed of or treated at the facility.

RCW 70.105D.040(1)(c). Razore argues that a seller of contaminated land disposes of it and, therefore, fits the (1)(c) definition. Razore relies on a case involving the sale of a decommissioned power plant that contained asbestos. *G.J. Leasing Co. v. Union Elec. Co.*, 54 F.3d 379 (7th Cir. 1995). The seller of the plant was excused from liability, with the court acknowledging that ordinarily "the sale of a product which contains a hazardous substance . . . itself or even the making of arrangements for its subsequent disposal . . . is not to be equated to arranging for the spillage of its hazardous contents." *G.J. Leasing*, 54 F.3d at 384. However, the court stated that disposal by sale could incur liability in extreme circumstances, such as where the owner of a facility containing hazardous substances sells the property to an unsuspecting buyer for the purpose of avoiding liability for cleanup costs. Razore asserts that the sale by Townhouse to Taliesen was an example of such extreme circumstances.

¶78 Razore did not assign error to any of the court's findings regarding Townhouse. The court did not find that Townhouse sold the property for the purpose of getting rid of a contamination problem. What the court found was this: Townhouse hired Golder in 1997 to prepare the phase I environmental site assessment. The phase I assessment described the removal of the underground storage tank and adjacent contaminated soils in 1990 but stated that the contamination from the tank was not demonstrated to have affected the site. Undisclosed in the phase I assessment was the contamination on the property at levels 120 times greater than cleanup levels.

¶79 In 1999, Golder prepared a geotechnical report on the property. A Golder principal, David Cotton, was aware that the report would contain a finding of some contamination deep in the property about 40 feet west of the location of the former storage tank. He orally advised Tony Simmons, an owner of Townhouse, to investigate the contamination further before building on the property, but he did not put this advice in writing and he did not share it with anyone else at Golder. The court found:

> Since Mr. Simmons was an agent of the company, Mr. Cotton's conversations with Mr. Simmons put Trevor/Townhouse on notice of the presence of contamination on the Property and that there was potential liability associated with the contamination. There is no evidence that Mr. Simmons of Trevor/Townhouse ever actually passed this information along to anyone at Trevor/Townhouse.

Finding of Fact 56.

> Neither Trevor/Townhouse nor Golder disclosed this information, or Mr. Cotton's advice to Mr. Simmons, to Taliesen at any time before Taliesen bought the Property.

Finding of Fact 57.

¶80 These findings do not compel a conclusion that Townhouse's sale of the property was actually an intentional abandonment of contaminants—a "disposal of a hazardous substance by subterfuge." *G.J. Leasing*, 54 F.3d at 384. They do not compel a conclusion that Townhouse's sale of the property was, even in part, an attempt to shift the actual disposal onto a buyer, such that Townhouse could be deemed to have disposed of the waste.

¶81 In making the "disposal by sale" argument on appeal, Razore also relies on this court's recent decision, *Modern Sewer Corp. v. Nelson Distrib., Inc.*, 125 Wn. App. 564, 109 P.3d 11 (2005). In *Modern Sewer*, Nelson Distributing, while delivering petroleum to a gas station, mistakenly pumped the 2,000 gallons into a well. From there, the petroleum ran into the groundwater. The station, suing for cleanup costs under the Act, alleged that Nelson was liable

because it had "arranged for disposal or treatment of the hazardous substance at the facility" under RCW 70.105D-.040(1)(c). Nelson advocated a limited definition of disposal as the act of discarding or throwing away, involving some element of intent. This court affirmed the trial court's ruling that Nelson's accidental pumping of gas into the well could be a "disposal" because under the Act, that term does not necessarily require intentional conduct. It "encompasses putting, placing, transferring, distributing, discharging, discarding, delivering, abandoning, depositing, injecting, dumping, and spilling." *Modern Sewer*, 125 Wn. App. at 571.

¶82 In that respect, the term "disposal" is broader than the ordinary dictionary meaning of " 'to transfer into new hands or to the control of someone else . . . ; to get rid of: throw away' " and " 'to alienate, relinquish, part with, or get rid of.' " *Modern Sewer*, 125 Wn. App. at 571 (quoting WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 654 (1971) and BLACK'S LAW DICTIONARY 471 (6th ed. 1990)). Razore contends that if even a narrow definition of "disposal" includes "to alienate," then Townhouse disposed of the contaminated property through the sale to Taliesen because a sale of real property is an alienation of real property.

¶83 In *Modern Sewer*, the substance disposed of was petroleum. The statute does not support broadening the definition of "disposal" to mean alienation of real property on which a facility is located because, if that were so, all former owners would be liable. The statute imposes liability upon any person "who owned or operated the facility at the time of disposal or release of the hazardous substances." RCW 70.105D.040(1)(b). Every former owner of a "facility" who has sold it to someone else has "alienated" it, and if the drafters had intended to make every former owner liable there would be no need to add "at the time of disposal or release of the hazardous substance." A statute is not supposed to be construed so as to make part of it inoperative or superfluous, unless the court concludes that the part is the result of obvious mistake or error. *State v. Tandecki*, 153 Wn.2d 842, 847, 109 P.3d 398 (2005).

¶84 In short, there was no basis for imposing upon Townhouse the liability of a former owner. Townhouse did not own the property at the time of disposal or release of the petroleum. The trial court correctly concluded that Townhouse was not liable.

## ALLOCATION OF LIABILITY FOR REMEDIATION COSTS

¶85 The trial court made Golder liable for 50 percent of past and future cleanup costs. Taliesen was made liable for 45 percent of past cleanup costs and 50 percent of future cleanup costs. Taliesen contends the allocation is unfair because its own conduct was not that egregious.

¶86 The Act confers discretion on the trial court to allocate liability for cleanup costs "based on such equitable factors as the court determines are appropriate." RCW 70.105D.080. This court reviews for abuse of discretion. *In re Yakima River Drainage Basin*, 112 Wn. App. 729, 748, 51 P.3d 800 (2002).

¶87 The trial court listed numerous equitable factors it considered in making the allocation of liability, among which was failure to disclose known conditions. In connection with the issue of what constitutes a substantially equivalent cleanup, we concluded the trial court did not err in allowing Taliesen to seek contribution from other parties despite its failure to satisfy Ecology's guidance regulations with respect to public disclosure. But this does not mean that Taliesen is morally exonerated for omitting to make public disclosure, and the court weighed that factor heavily against Taliesen when it came to allocation of liability. Not only did Taliesen fail to notify required parties of the cleanup at the time it was going on, it also failed to make disclosures about the oozing black liquid seen on the shoring wall after the contaminated soil inside the building footprint had been hauled away. The court had "grave concerns that Taliesen built and marketed the condominiums while there is still an outstanding issue regarding the

remaining contamination and the potential liability." Finding of Fact 80.

¶88 Taliesen contends the court should have given more weight to the fact that Taliesen played no part in generating the contamination. The court acknowledged that "owners who take no active role in the contamination-causing activities are generally assessed a nominal percentage of fault," Conclusion of Law 22, but nevertheless concluded that Taliesen's disregard of public notice obligations should result in a substantial share of liability for cleanup costs:

> As of the last day of trial, Taliesen continued to sell condominium units to people without disclosing the remaining contamination or the potential liability. Taliesen did not take any action to put potentially liable parties on notice of the clean up. Taliesen deprived the other parties of the opportunity to participate in the remedial action because it failed to provide notice in accordance with MTCA. Taliesen also failed to give notice of its remedial action to the public, the Department of Ecology, and the Department of Health, as required under MTCA.

Conclusion of Law 29.

¶89 Taliesen relies on a number of cases in support of its argument for reversal of the allocation decision. But the cases, all affirmances, establish that the trial court has the discretion to allocate liability based on equitable factors as the court considers appropriate. *See Dash Point*, 86 Wn. App. at 603 (affirming allocation of costs to Exxon based on court's discretion to apply equitable factors and Exxon's failure to provide full record for review); *Bedford Affiliates v. Sills*, 156 F.3d 416 (2d Cir. 1998) (affirming allocation of 5 percent to absentee owner and 95 percent to tenant); *Alcan-Toyo Am., Inc. v. N. Ill. Gas Co.*, 881 F. Supp. 342, 345 (N.D. Ill. 1995) (based on parties' relative fault, district court allocates 10 percent of cleanup costs to nonpolluting recent owner who did no environmental due diligence before buying site). Here, the court saw Taliesen's failure to comply with public notification requirements as egregious. This was a tenable basis for the

allocation of almost half the allowable cost of cleanup to Taliesen. We find no abuse of discretion.

## ATTORNEY FEES AT TRIAL

A. Determination of Prevailing Parties

¶90 Golder and Razore contend that the trial court erred in ordering them to pay Taliesen's attorney fees.

¶91 The prevailing party in an action to recover cleanup costs "shall recover its reasonable attorneys' fees and costs." RCW 70.105D.080. A plaintiff prevails by establishing all of the elements of the contribution claim under RCW 70.105D.080. *City of Seattle v. Dep't of Transp.*, 107 Wn. App. 236, 240, 26 P.3d 1000 (2001).

¶92 Whether a party is entitled to attorney fees is an issue of law which is reviewed de novo. Whether the amount of fees awarded was reasonable is reviewed under an abuse of discretion standard. *Ethridge v. Hwang*, 105 Wn. App. 447, 460, 20 P.3d 958 (2001).

¶93 A concern identified by Golder is the disparity between the amount of cleanup costs Taliesen sought to recover at trial (over $500,000) and the amount Taliesen will actually receive by the judgment (a net of about $35,000 after Taliesen's own contributory share is deducted).

¶94 Golder claims that Taliesen rejected a substantial pretrial offer and then recovered much less. Golder would have us establish a rule that a party who does not obtain at trial what was offered before trial cannot be accorded prevailing party status. Golder's description of the pretrial offer is questionable, but even if it were accurate, the Act does not provide the rule Golder requests. Golder cites *Richter v. Trimberger*, 50 Wn. App. 780, 784, 750 P.2d 1279 (1988), but the outcome of that case depended on its "peculiar nature" and cannot be generalized to spare Golder's obligation to pay attorney fees. Taliesen won its suit based on the Act. Golder was not the prevailing party on that suit; Taliesen was.

¶95 Razore contends that the trial court should have used the net affirmative judgment rule to determine that Razore was a prevailing party against Taliesen. *See Moritzky v. Heberlein*, 40 Wn. App. 181, 183, 697 P.2d 1023 (1985). In *Moritzky*, a contractor prevailed on a lien claim against a homeowner, while the homeowner prevailed on a counterclaim for negligent and incomplete work. The homeowner ended up with an affirmative judgment after setoffs, which meant that the trial court erred in awarding attorney fees to the contractor on the lien claim. *Moritzky* thus applies the rule that the prevailing party is the party in whose favor an affirmative judgment is rendered at the conclusion of the entire case. *Moritzky*, 40 Wn. App. at 183. That rule does not favor Razore in this case. The only claim litigated was Taliesen's claim for contribution of cleaning costs. In defending against that claim, Razore was successful in whittling down the compensable costs and in persuading the court to make Taliesen bear a large share of them, but in the end the judgment was for Razore to pay Taliesen; there was no claim under which Taliesen could have become liable to pay Razore. For the same reason, this case is unlike another case cited by Razore, *Marassi v. Lau*, 71 Wn. App. 912, 859 P.2d 605 (1993). *Marassi* calls for a "proportionality" approach to an award of attorney fees "where multiple distinct and severable contract claims are at issue." *Marassi*, 71 Wn. App. at 917. In an action under the Act, ordinarily the claim for contribution is the sole claim being litigated. That was true in this case. Taliesen voluntarily incurred the costs of cleaning up a mess it did not make, the underground storage tank leak, with no guarantee that any other entity could be held liable for contribution. This basic fact makes it fair for Taliesen to recover attorney fees as a prevailing party once Razore's liability for the leak was established, even though Taliesen's own ineptitude led to an award of remedial costs that was small in comparison to what Taliesen actually spent. Razore did not clean up the mess and thus did not have a claim for contribution. By establishing that Razore and Golder were liable for contribution, Taliesen became a prevailing party

as against them. The statute entitles Taliesen to an award of fees against Razore even though Razore has a smaller share of liability.

¶96 Neither Golder nor Razore have identified a basis in statute or case law for denying prevailing party status to a plaintiff who establishes the elements of a claim but proves substantially less damages than requested and is allocated a share of the liability. We affirm the court's determination that Taliesen was a prevailing party.

¶97 Golder claims the record is inadequate for review of the award to Taliesen because the findings and conclusions do not state a reasonable hourly rate or a reasonable number of hours. Failure to create an adequate record will result in a remand of the award to the trial court to develop such a record. *Mayer v. City of Seattle*, 102 Wn. App. 66, 78-79, 10 P.3d 408 (2000). But the findings needed for meaningful review do not ordinarily require such details as an explicit hour-by-hour analysis of each lawyer's time sheets. *Progressive Animal Welfare Soc'y v. Univ. of Wash.*, 54 Wn. App. 180, 187, 773 P.2d 114 (1989).

¶98 The parties provided declarations detailing the hourly rates of their attorneys and the amount of time spent on claims for which they allege they should recover. Attorneys for Taliesen, Razore, and Murphy all billed about the same hourly rates. Golder makes no argument that the hourly rates are excessive. This record is adequate for review of the hours spent.

¶99 Golder contends the court failed to explain why it refused to segregate $50,000 in Taliesen's fees that Golder alleges are attributable to unsuccessful common law claims or clerical tasks. Golder submitted briefing and evidence on this point in its motion in opposition to Taliesen's motion for fees. The judgment and order of August 10, 2004, makes a finding that the sums awarded "do not include clerical charges which were not included in the definition of costs under a MTCA award . . . and do not include charges or billings for matters other than MTCA claims." Golder has

not shown this explanation to be unsatisfactory, and we accept it as sufficient.

¶100 Golder argues that it was unfair and an abuse of discretion for the court to award Taliesen almost 100 percent of its fees and costs, even though Taliesen was made 45 percent liable for past costs, 50 percent liable for future costs, and recovered only 5 percent of the amount claimed for cleanup costs. Golder contends the fee award must be reasonable in relation to the results obtained at trial and the court should have discounted the total hours claimed because of Taliesen's weak recovery. Cases decided under the Act do not support this argument.

¶101 In *Mayer*, a property owner sued defendants both in tort and for recovery of cleanup costs under the Act. The trial court dismissed the tort claims on summary judgment. The court found the defendants liable under the Act and awarded Mayer about $26,000 in cleanup costs and about $280,000 in attorneys' fees and costs. The liable parties challenged the attorney fee award based on the disparity between the amount of the award and the underlying judgment. This court rejected that argument. The amount of the underlying judgment "is relevant in determining the reasonableness of the fee award, but is not a conclusive factor." *Mayer*, 102 Wn. App. at 83. The relevant question on appeal is whether the court properly applied the lodestar methodology. "We will not overturn a large attorney fee award in civil litigation merely because the amount at stake in the case is small." *Mahler v. Szucs*, 135 Wn.2d 398, 433, 957 P.2d 632 (1998) (quoted in *Mayer*, 102 Wn. App. at 83).

¶102 The trial court's findings show that it considered the size of Taliesen's recovery when determining the fee award. Under *Mayer*, it is within the scope of the trial court's discretion to award Taliesen fees in an amount that greatly exceeds the underlying judgment. We reject Golder's argument that the Act imposes a special obligation upon the trial court to make findings about equitable factors that went into its attorney fee decision. The statute

provides that recovery of remedial action costs, including reasonable attorneys' fees and expenses, shall be based on equitable factors, but this is a reference to attorney fees incurred in the cleanup process, not in a trial of an action brought after remedial costs are incurred. RCW 70.105D-.080.

¶103 Also pertinent is *Dash Point*, where the shopping center recovered $375,000 in attorney fees and costs, even though the cleanup costs recovered were about $20,000. Affirming, this court explained that the relationship between the amount of the recovery and the fees is relevant under some circumstances and the reasonableness of the discrepancy between the judgment and the fee award is a fact-specific inquiry. The court called the shopping center recovery of past cleanup costs and a judgment of Exxon's liability for future cleanup costs a "significant result." *Dash Point*, 86 Wn. App. at 612.

¶104 Taliesen, too, got a significant result when the court imposed judgment for future cleanup costs along with the judgment for past costs. The judgment was against Golder, which undercuts Golder's argument that the fee award was disproportional to the result. Considering how Golder's egregious nondisclosures permeated the history of the development, we do not find the award of fees against Golder so unfairly disproportional as to amount to an abuse of discretion.

B. Allocation of Liability for Attorney Fees

¶105 Golder claims that the findings fail to explain why Golder was held liable for more than $92,000 of Murphy's fees and costs, when Murphy attributed only $350 to defending against Golder's cross claim. Golder asserts that the award is punitive in violation of public policy and should be reversed.

¶106 Murphy requested a fee award consisting of a large contribution from Taliesen and a very small one from Golder or, in the alternative, an award allocated to Taliesen, Razore, and Golder in proportion to each party's liability for

past cleanup costs. The court noted that liability was joint and several, and ordered Taliesen, Razore, and Golder to pay roughly equal shares of Murphy's fees.

¶107 Taliesen, Razore, and Golder all alleged that Murphy was liable as an operator under the Act so Murphy's efforts to defend against one party were equally necessary to defend against the others. Murphy's arbitrary attribution of all the fees to Taliesen is not controlling. The court did not abuse its discretion.

## C. Reduced Fee Award

¶108 Murphy, as a prevailing party, received an award of approximately $249,000 for attorney fees and costs. Murphy had requested some $343,000.[2] Murphy contends the court abused its discretion by failing to find facts to support the reduction in the request.

¶109 An attorney fee award is left up to the discretion of the trial court. *Mayer*, 102 Wn. App. at 79. However, an award of substantially less than the amount requested should indicate at least approximately how the court arrived at the final numbers and explain why discounts were applied. *Absher Constr. Co. v. Kent Sch. Dist. No. 415*, 79 Wn. App. 841, 848, 917 P.2d 1086 (1995).

¶110 Most likely, the trial court reduced Murphy's fee award based on the reasons given by Taliesen in its opposition to Murphy's motion for fees and costs. Taliesen asked the court to deduct more than $110,000 from Murphy's claim for work on claims not under the Act, for unsuccessfully opposing Taliesen's motions for summary judgment, for unsuccessful motions to exclude an expert for Taliesen's testimony and for dismissal under CR 41(b)(3), for nonresponsive answers to Taliesen's written discovery requests, and for unnecessary expert fees. But because the record does not explain the court's reasoning, review is not possible. The trial court must provide articulable grounds for its fee

---

[2] Murphy's appeal brief repeatedly claims it incurred fees and costs in the amount of $366,284.63, but the trial record shows the total claim was for $343,307.50. Clerk's Papers at 3691.

award. *Mahler*, 135 Wn.2d 398. We remand the fee award to the trial court for findings explaining how the fee award to Murphy was calculated and the basis for the deductions.

## MOTION TO REOPEN

¶111 On August 2, 2004, Taliesen filed a motion to reopen the case, seeking to reduce its 45 percent share of liability for cleanup costs. The allocation of 45 percent to Taliesen reflected the court's concern that Taliesen knowingly concealed the existence of contamination outside the building footprint from Ecology and condominium owners. Taliesen sought to submit additional evidence to counter that concern. The evidence included a supplemental report to Ecology by Landau Associates on May 3, 2004, stating that samples from the remaining contamination in the southeast corner of the property contained petroleum levels below Act cleanup levels and that observations during construction showed limited residual contamination behind the southern shoring wall; Ecology's response, which reaffirmed its August 8, 2002, no further action determination; and an addendum to Taliesen's public offering statement to condominium owners, which provided information about the remaining contamination. The court denied the motion but noted that the evidence "may be relevant to the issue of liability for future damages."

¶112 Taliesen appeals. This court reviews for a showing of abuse of discretion and prejudice to the complaining party. *Henery v. Robinson*, 67 Wn. App. 277, 285, 834 P.2d 1091 (1992).

¶113 The evidence showed that Taliesen disclosed the remaining contamination to Ecology and to condominium owners and buyers only after the trial. It does not address the basis for the court's allocation of liability, which was based on evidence of Taliesen's omissions before the trial ended. The court did not abuse its discretion.

## POSTJUDGMENT INTEREST

¶114 The final judgment summary states the postjudgment interest rate on Taliesen's judgment as 12 percent per annum. The statutory rate of postjudgment interest was formerly 12 percent, but that is no longer the case as the result of an amendment to RCW 4.56.110(3) effective June 10, 2004. Taliesen concedes that the postjudgment interest rate on the judgment summary should be modified accordingly. This should be addressed on remand.

## ATTORNEY FEES ON APPEAL

¶115 All of the parties request attorney fees and costs on appeal. The Act authorizes prevailing party attorney fees. RCW 70.105D.080. This applies to successful appellate actions as well. *Dash Point*, 86 Wn. App. at 613 n.39.

¶116 Our decision leaves the parties where we found them as to the major issues they raise on appeal. Razore has not substantially prevailed on any issue. It remains liable for contribution to Taliesen and liable for attorney fees at trial. It was unsuccessful in imposing liability upon Murphy and Townhouse. Razore's request for attorney fees on appeal is denied.

¶117 Taliesen has successfully defended against efforts by Razore and Golder to avoid their liability for cleanup costs and attorney fees. However, Taliesen has not substantially prevailed against them in its own appeal. The allocation of liability to Taliesen remains unchanged, the finding as to cost of disposal remains unchanged, and Taliesen has not established a right to sue Golder for negligence. If both parties prevail on major issues, it is appropriate to let each bear their own costs and fees. *Transpac Dev., Inc. v. Young Suk Oh*, 132 Wn. App. 212, 217, 130 P.3d 892 (2006). We conclude that Taliesen is not entitled to an award of attorney fees against Razore or Golder.

¶118 Golder has not substantially prevailed on its appeal either. Murphy is not liable as an operator, the statute of repose does not bar Taliesen's action, and the award of attorney fees to Taliesen remains substantially unchanged. Although Golder has successfully defended against Taliesen's negligence claims, this was not such a significant issue as to entitle Golder to an award of appellate attorney fees from Taliesen.

¶119 Murphy has not substantially prevailed on its appeal in which it joined Golder in arguing for application of the construction statute of repose. But a far more significant issue for Murphy was the claim by Razore, Taliesen, and Golder that Murphy was an operator. Murphy prevailed on this issue on appeal and is entitled to an award of appellate attorney fees against those three parties for work related to operator liability.

¶120 Townhouse prevailed on appeal against Razore's attempt to make it liable as a former owner. Townhouse is entitled to an award of fees on appeal.

¶121 Affirmed except as to the award of fees to Murphy and postjudgment interest. Remanded for proceedings to address those two issues.

GROSSE and BAKER, JJ., concur.