259 P.3d 1115 (2011)
162 Wash.App. 627
PACIFICORP ENVIRONMENTAL REMEDIATION COMPANY, a Delaware corporation, and Puget Sound Energy, a Washington corporation, Respondents,
v.
WASHINGTON STATE DEPARTMENT OF TRANSPORTATION, a department of the State of Washington, Appellants.
No. 39699-8-II.
Court of Appeals of Washington, Division 2.
July 19, 2011.
*1116 Deborah L. Cade, Office of the Attorney General, Ian A. Northrip, Attorney at Law, Olympia, WA, for Appellants.
Louis Anthony Iv Ferreira, Attorney at Law, Vancouver, WA, Loren Robert Dunn, Riddell Williams PS, Seattle, WA, for Respondents.
HUNT, J.
¶ 1 The Washington State Department of Transportation (DOT) appeals: (1) the trial court's finding that it was liable to PacifiCorp Environmental Remediation Company (PERCO) and Puget Sound Energy (collectively, the Utilities) under Washington State's Model Toxics Control Act (MTCA), chapter 70.105D RCW; (2) the trial court's ruling that it (DOT) must contribute to the Utilities' costs of cleaning up contamination from the Thea Foss Waterway (Waterway), which the United States' Environmental Protection Agency (EPA) designated as a Superfund site in the mid 1980s; and (3) the trial court's award of attorney fees and costs to the Utilities.
¶ 2 DOT contends that the trial court committed the following reversible errors: (1) ruling that DOT is liable under the MTCA; (2) equitably allocating contribution cleanup costs in favor of the Utilities; and (3) awarding the Utilities attorney fees and costs. More specifically, DOT argues that the trial court erred by ruling that DOT is liable under the MTCA because (1) storm water from multiple sources, rather than coal tar from DOT's DA-1 Line French drains,[1] caused the increase in Waterway contaminant levels; (2) the evidence is insufficient to support the trial court's finding that DOT's State Route (SR)-509 construction released contaminants into the Waterway; (3) DOT is not a "owner or operator" under RCW 70.105D.040(1)(a) and (b); (4) DOT is not an "arrang[er]" under RCW 70.105D.040(1)(c); and (5) DOT qualifies for the "utmost care" exception to liability under RCW 70.105D.040(3)(a)(iii), which renders it not liable for the release of hazardous substances associated with the SR-509 construction. Br. of Appellant at 26.
¶ 3 DOT also argues that the trial court erred in its equitable allocation of clean-up contribution costs because (1) the trial court did not find that DOT's release of contaminants "created or significantly contributed to a threat to human health"; (2) substantial evidence does not support the trial court's finding that DOT was "recalcitran[t]" in preventing the further release of contaminants and cooperating with the Washington State Department of Ecology (Ecology); (3) the trial court did not determine DOT's "fractional share of responsibility"; and (4) the trial court did not "set out how [it] arrived at [the $6 million in cleanup costs awarded against DOT]" because it failed to determine how much the Utilities had spent on cleanup in excess of their own share of cleanup costs and third party contributions. Br. of Appellant at 44, 45. 48, 50.
¶ 4 We affirm.

FACTS
¶ 5 In 1998, PERCO, a Delaware corporation with its principal place of business in Oregon, was established by its parent corporation to manage the company's "environmental remediation projects." 8 Verbatim Report of Proceedings (VRP) at 1115. Puget Sound Energy is a Washington corporation with its principal place of business in Washington. DOT is the State of Washington's transportation agency.

I. Superfund Site Creation

A. Coal Gasification Site
¶ 6 The Utilities' predecessors were the former owners of the Tacoma Coal Gasification *1117 Plant (the Plant), located on land "bounded by South 21st and South 24th Streets, and A Street and Thea Foss ... Waterway[2]" (the Site) in Tacoma. Clerk's Papers (CP) at 796. From 1884 until 1924, the Tacoma Gas Company operated the Plant, which produced coal gas[3] until 1909, when Tacoma Gas converted the Plant to manufacture carbureted water gas, which used "residual grade fuel oil" in its manufacture. CP at 755. The next year, Tacoma Gas installed three 105,000-gallon crude-oil storage tanks, which contained coal tar and other coal gasification waste materials. In 1924, the Site owners deactivated the Plant and ceased gasification operations; three years later they abandoned the Plant.
¶ 7 Beginning in the 1960s, Washington Gas & Electric Company[4] began to sell off portions of the Site. In 1984, on behalf of the State, DOT purchased a portion of the Site from Washington Gas & Electric Company and began construction of Interstate 705 (I-705) to link Interstate 5(I-5) with downtown Tacoma. Construction preparation uncovered coal tar "in the area between Puyallup Avenue, A Street, and South 21st Street,"[5] and "three buried tank structures containing coal tar and other waste materials associated with [the] coal gasification process." CP at 49.
¶ 8 A consulting firm studied the Site's soil and groundwater to assist DOT and Ecology in addressing coal tar disposal, construction safety, and environmental impacts. Working with Ecology, DOT performed cleanup[6] in the vicinity of the Site in 1985; DOT spent $5.3 million in this cleanup effort.[7] Nevertheless, contaminated soil and a "significant amount of coal tar" remained after the cleanup. 1 VRP at 110.

B. Coal Tar Drainage from Site under I-705 to Waterway
¶ 9 In 1986, as part of an agreement with Tacoma, DOT "abandoned the access road to Dock St. from Puyallup Avenue," and replaced it with "a connector road between Dock Street and A Street" that passed under I-705, known as the "DA-1 Line."[8] DOT installed "French drains" two feet below the surface in a "porous" "bed of pea gravel" to stabilize the DA-1 Line bed, "to drain off ... shallow groundwater" in the area near A Street and Dock Street under the I-705 overpass, and to avoid erosion problems on the DA-1 Line connecter road.[9] The DA-1 Line French drains connected to a storm drainage system that DOT installed to serve "a portion of I-705 as well as the impervious areas under the freeway, specifically a parking lot and [the] D-A [Line]," which connected to storm water catch basins and ultimately, *1118 to outfalls[10] draining into the Waterway. CP at 141.
¶ 10 In early spring 1992, Ecology collected a sediment sample "of concern" from one of the storm water catch basins attached to the DA-1 Line French drains.[11] This sample "indicated that free coal tar [wa]s entering the storm water system, and it appear[ed] to be originating from the area that was partially cleaned up during the [I-705] construction." CP at 50. Ecology tested this catch basin and determined that the basin drained into the Waterway. An April 1992 sample "from a storm drain catch basin in the DA-1 [L]ine" comprised "sludges" containing the following contaminants: 1,137,000 ug/kg low molecular weight polycyclic aromatic hydrocarbons (LPAHs) and 229,600 ug/kg high molecular weight polycyclic aromatic hydrocarbons (HPAHs),[12] well in excess of the Commencement Bay Sediment Quality Objectives (SQOs[13]) of 5,200 ug/kg for LPAHs and 17,000 ug/kg for HPAHs.[14] A later inspection revealed a tar "sheen ... covering an area approximately 6 feet wide by 25 feet long extending along the [Waterway] shoreline at low tide," which "appear[ed] to confirm the likelihood that coal tar [wa]s entering the [W]aterway directly from the contaminated near-shore area."[15] A sample of this tar contained 4,741 ug/1 total PAH, well above the 300 ug/1 Marine Acute Water Quality Criterion for total PAH.
¶ 11 On July 17, further investigations revealed that:
[t]he [DA-1 Line French drains] . . . appeared to provide a conduit for suspected coal tar material to enter the drainage system. [Tacoma] confirmed that the on-site storm drainage system ultimately discharged to the Thea Foss Waterway via Outfall 237A.[16]
CP at 142. During spring and summer 1992, Tacoma sealed and abandoned catch basin CB3 and plugged inlets in catch basin CB1, both of which provided drainage for DOT's I-705 construction project. This effort "temporarily prevented coal tar material from entering the storm drains," but it did not prevent coal tar material from ultimately making its way to the Waterway. CP at 142.
¶ 12 Sometime in the early 1990s, DOT attempted to "turn back [to Tacoma] ownership" of the DA-1 Line, the DA-1 Line French drains, and the storm drainage system.[17] Tacoma discovered that DOT had used a "corrugated metal drain pipe" that was inconsistent with Tacoma regulations "call[ing] for the use of reinforced concrete pipe."[18] Consequently, Tacoma refused to take ownership of the DA-1 Line and the drainage system, and DOT retained responsibility for them.
¶ 13 Around 1993, Ecology discovered "fairly copious quantities of free flowing tar, tar waste" within the "bedding material" that DOT had used to bury the French drains under the DA-1 Line.[19] Ecology strongly suspected that this tar waste was flowing from the vicinity of the Site into the DA-1 Line French drains, on into the storm drain system, and ultimately to the Waterway. After the DOT pumped the catch basins, Ecology later discovered that coal tar had "reaccumulated" at the bottom of them. 5 VRP at 656.
¶ 14 In the mid 1990s, both Tacoma and Ecology documented "visual evidence of *1119 product infiltrating into . . . CB1."[20] In 1995 or 1996, in an attempt to prevent any contaminants from entering the storm water catch basins that connected to the DA-1 Line French drains, DOT placed a mixture of concrete and cement around them. Nevertheless, contaminants still continued to infiltrate the catch basins, and the DA-1 Line French drains continued to contaminate the Waterway. In March 2003, with oversight by Ecology, DOT attempted to halt discharge from the DA-1 Line French drains into the Waterway, by severing the connection between these drains and Tacoma's sewer system. This effort, which "cut off" the "pathways for tar-related contamination from the [Site] to the [W]aterway," cost DOT $50,000.[21]

C. SR-509 Construction; Tar and Storm Drain Vactor Waste
¶ 15 A March 6, 1995 "Agreed Order" between Ecology and DOT required DOT to notify Ecology when DOT began construction of the SR-509 cable bridge across the Waterway.[22] An August 7, 1995 report (1) stated that DOT planned to construct eleven "pier footings" and two "drilled piers" to support the on- and off-ramps for the cable bridge; (2) explained that some of the pier footings and piers themselves "[we]re located within the boundaries of the [Plant]"; and (3) anticipated that "[c]ontaminated soil, groundwater, or both [might] be encountered at these locations during construction."[23] DOT also planned to demolish parts of I-705 located within the "footprint" of the Site.[24]
¶ 16 DOT began the construction without giving Ecology notice. DOT excavated areas approximately 30 feet by 30 feet and 12 feet deep, uncovering liquid tar and exposing portions of the DA-1 Line French drains to this liquid tar. DOT covered up the MH792 manhole[25] with dirt.[26] At a different location along the Waterway, DOT constructed a storm water retention pond to capture runoff from SR-509; the area near the retention pond contained a fuel oil line. As DOT began to excavate the area to create the pond, the excavated area began to fill up with water.
¶ 17 Ecology employee Marv Coleman gave DOT permission to pump water to drain the pond, but only after it obtained a temporary "water quality modification" permit.[27] But DOT began pumping water from the excavated area into the Waterway without first obtaining the necessary permit or notifying Coleman. DOT's water pumping caused oil to flow into the excavated area and 50 gallons of oil to spill into the Waterway. This spill required "a fair amount of cleanup work," for which Ecology fined DOT $12,500.[28]
¶ 18 Near I-5, DOT also operated a storm drain vactor waste facility.[29] DOT originally used this facility for disposing of "slide materials, ditching, shoulder build-up material, and sweepings."[30] By the mid 1990s, the vactor facility became full; so DOT decided to "mine[ ], screen[ ], test[ ] and then use[ ]" these materials "in a variety of landscaping and maintenance projects around the region," which activities eventually returned the vactor site to a lower elevation.[31]

*1120 II. Superfund Site Designation
¶ 19 In 1981, the EPA placed Commencement Bay on a list of 115 "highest priority hazardous waste sites."[32] Two years later, the EPA promulgated the National Priorities List,[33] which classified the Commencement Bay site as two hazardous waste areas: the South Tacoma Channel (CB/STC) and nearshore/tideflats (CB/NT), which encompasses the old Tacoma Coal Gasification Plant Site.

A. Contamination Source Control Efforts
¶ 20 In April 1983, the EPA and Ecology entered into a "CERCLA Cooperative Agreement" designating Ecology as "the lead agency for a remedial investigation/feasibility study [ (RI/FS) ] on the nature and extent of the contamination [in the CB/NT site]."[34] This designation made Ecology responsible for the "nature and extent of sediment contamination" at the Site.[35]
¶ 21 In 1985, Ecology published the remedial investigation and feasibility study for portions of the RI/FS, which identified several "[p]roblem [a]rea" bodies of water that required remediation of contaminated sediments.[36] One of these "problem areas" was the head of the Waterway, for which the remedial investigation identified a variety of contaminants, from sources including "historical discharges, ongoing discharges from city storm drains, and ongoing discharges from contaminated sites along the [W]aterway."[37]
¶ 22 In 1989, the EPA (1) issued a final Record of Decision "on the remedial action to be implemented at the CB/NT Site"[38]; (2) "selected a remedial action" for the "Head of Thea Foss Waterway"[39]; and (3) entered into another "Cooperative Agreement" designating Ecology as "the lead agency for source control of hazardous substances from upland areas . . . that are contributing contamination to the areas identified in [the EPA's Record of Decision] as requiring remediation," including the Waterway.[40] The EPA notified DOT that it was a "potentially responsible party"[41] under CERCLA for having released hazardous substances at the CB/NT site.[42] CP at 1582.
¶ 23 In May 1992, Ecology and the EPA issued a "Source Control Strategy [that] outlined how Ecology[ ] . . . would prioritize, organize and conduct source control activities" "to prevent recontamination of sediments."[43] This Source Control Strategy outlined five steps or "milestone[s]": (1) "investigate[ ] and evaluat[e] . . . all potential sources" of contamination; (2) put in place all "essential administrative actions," such as orders, decrees and permits for "`major sources' of problem chemicals in each problem area"; (3) implement "essential remedial actions for all major sources" of contamination; (4) implement "administrative actions" for ongoing and newly discovered sources; and (5) execute all remedial actions, such as construction and removal, for all sources. CP at 655-56.
¶ 24 In 1993, the EPA sent various parties, including the Utilities, a "general notice letter" that they also were CERCLA "potentially responsible parties" (PLPs) for the CB/NT *1121 site.[44] On October 28 of that year, Ecology issued an "Agreed Order" to a group of seven "potentially liable parties" under the state MTCA.[45] These parties included Tacoma, DOT, the Utilities, and Advance Ross[46] because they "had an ownership interest or corporate successorship to people who had ownership interests in the [Plant]."[47] In the 1993 Agreed Order, Ecology instructed these "PLPs" "to perform interim remedial actions" to investigate and remediate "source(s) of potential ongoing contamination to the Thea Foss Waterway from the Site, and develop and implement intern remedial options for mitigation of that ongoing contamination."[48] Tacoma took "the lead" on conducting the remedial investigation.[49] Despite having signed the 1993 Agreed Order, however, DOT "dropp[ed] out" of the collaborative effort that this order embodied.[50] Thereafter, Ecology never attempted to enforce the 1993 Agreed Order against DOT.

B. Waterway Remedial Efforts
¶ 25 In 1994, Tacoma voluntarily entered into an "Administrative Order on Consent" with the EPA to address the contaminated sediments in the Waterway. This agreed order set forth terms "for the preparation of, performance of, and reimbursement of oversight costs" for the Waterway contamination remediation.[51] Tacoma invited between 10 and 15 EPA-designated "potentially responsible parties," including DOT, to form a working group to investigate Waterway remedial efforts, called "the Intra-Participants Group." 1 VRP at 136.
¶ 26 The Intra-Participants Group formed a committee to investigate the need for remedial action in the Waterway. This investigatory process lasted approximately five to six years and cost several million dollars, of which DOT contributed $25,000 and Puget Sound Energy contributed "a significant portion."[52] The Intra-Participants Group also (1) organized the Allocation Process Group,[53] (2) "interview[ed] potential arbitrators that could come in and convene a broader process by which the costs that were ultimately incurred in investigating and remediating [the] Thea Foss Waterway would be shared,"[54] and (3) selected Advanced Analytical Solutions, Inc., owned by William Hengemihle, as the Arbitrator. The Arbitrator designated to each party within the Allocation Process Group a percentage of costs to contribute, allocating responsibility and costs on the assumption that total cleanup costs were approximately $60 million,[55] which, according to Hengemihle, however, actually exceeded $100 million.
¶ 27 The Allocation Process Group's "comprehensive settlement" allocating cleanup costs ultimately covered 185 parties, only about 80 of which belonged to the Allocation Process Group.[56] The other 105 parties were "orphan" parties that had been unable to participate in the allocation process because of, for example, insolvency.[57] The Arbitrator's *1122 process gave the 80 participating parties a "cashout" option that involved paying a "lump sum" and premium in exchange for not having to perform the actual remediation.[58] Sixty-three parties paid premiums totaling $13.2 million, of which the Utilities received $1 million and Tacoma received the rest.[59] In 1994, the Allocation Process Group and Tacoma entered into a "Funding and Participation Agreement for the Thea Foss and Wheeler Osgood Waterway Remedial Design Study," agreeing
(1) to facilitate mutual cooperation between the signatories and [Tacoma] with regard to the [Administrative Order on Consent entered into by Tacoma and the EPA, see CP at 837, 2106], and (2) to provide funding for performance of the [Administrative Order on Consent] obligations.
CP at 837.
¶ 28 The Arbitrator allocated to DOT 5.26 percent of "remedy cost[s]" and 13.147 percent of "study costs." During summer 2001, the Arbitrator invited DOT to participate as either a "performing" or a "cashout" party in the Allocation Process Group. DOT declined to participate because it believed that the Allocation Process Group should give DOT more credit for the cost of its work on "upland properties." The EPA, however, did not allow the Allocation Process Group to credit such "upland costs." 8 VRP at 1070-75.
¶ 29 During fall 2001, the Allocation Process Group submitted to the EPA a "Settlement Framework Memorandum" explaining the agreement achieved through the Arbitrator's process. This memorandum divided the parties into four groups: (1) "the performing parties" (who would perform the actual cleanup of the Waterway); (2) "[t]he cashout parties" (who paid premiums in instead of performing the cleanup); (3) "the orphan share parties" (who could not participate by virtue of insolvency or other reasons); and (4) the "nonparticipant viable parties." 8 VRP at 1062.
¶ 30 Some Allocation Process Group parties also submitted "good faith offers" to clean up the Waterway.[60] The Utilities, for example, submitted an offer to the EPA under which the Utilities proposed to design and to implement remedial actions in "Remedial Action Areas 23 and 24" and the southern portions of the "Remedial Action Areas 19b, 20, and 22" (the Utilities' Work Area). Tacoma agreed to take responsibility for "Remedial Action Areas 1 through 22" (City Work Area).[61] Subsequently, the Utilities and Tacoma entered into a Memorandum of Understanding (Memorandum) with each other and signed Consent Decrees with the EPA, confirming this allocation of responsibility.
¶ 31 The Utilities began remedial activities on September 19, 2003, completed the cleanup on February 27, 2004, and, in October 2004, notified the EPA that "all . . . construction activities [we]re completed."[62] On September 29, 2006, the EPA provided the Utilities with a "certification of the remedial action construction performed in Remedial Actions 23 and 24 in the head of the [W]ater-way."[63] On June 24, 2008, the EPA provided the Utilities with another certification. The Utilities and their assignors spent $116,153,162 on Waterway investigation and remediation costs.

III. Procedure
¶ 32 The Utilities filed a complaint against DOT under Washington's MTCA, chapter *1123 70.105D RCW. The Utilities asserted that DOT had contributed significantly to polluting the Waterway with hazardous substances, had refused to participate in the EPA-mandated cleanup, and should reimburse the Utilities for having cleaned up DOT's share of the contamination.[64] The Utilities sought at least $12 million[65] contribution from DOT for these cleanup costs, declaratory relief entitling them "to contribution from DOT for costs incurred on the Waterway in the future," and reasonable attorney fees and costs. CP at 8.

A. Pre-Trial Rulings
¶ 33 The Utilities moved for partial summary judgment, asking the trial court to rule that DOT was liable for cleanup costs under the MTCA on several alternate grounds: (1) as an "own[er] and/or operat[or]" under RCW 70.105D.040(1)(b); (2) as an "arrang[er]" under RCW 70.105D.040(1)(c); or (3) as a "transport[er]" under RCW 70.105D.040(1)(d).[66] CP at 2033-37. The trial court granted the Utilities' motion for partial summary judgment, ruling that DOT was liable under the MTCA "with respect to the Utilities' claims derived from releases associated with DOT's DA-1 line draining system."[67] CP at 1725.
¶ 34 DOT also moved for partial summary judgment, which the trial court granted in part, ruling that DOT was entitled to judgment as a matter of law for the Utilities' contribution claims based on (1) the state highways' storm water[68] contributions to the release of hazardous substances into the Waterway, (2) DOT's "owner[ship]" of the Waterway, and (3) DOT's "owner[ship]" of various highway facilities that released hazardous substances into the Waterway.[69] The trial court, however, denied DOT's motion for summary judgment on the Utilities' claims that (1) DOT's SR-509 construction caused or contributed to a release of hazardous substances, (2) a release of petroleum products from a DOT detention pond contributed to a release of hazardous substances, and (3) material from DOT's vactor solids disposal site one mile from the Waterway caused or contributed to a release of hazardous substances into the Waterway.
¶ 35 In sum, the Utilities argued that DOT was liable under the MTCA based on four different activities: ownership and operation of the DA-1 Line French drains, SR-509 construction, ownership and operation of the storm water retention pond, and ownership and operation of the vactor waste facility. Ruling that DOT was liable as a matter of law based on only the first activity, the DA-1 Line French drains, the trial court granted summary judgment to the Utilities on only that ground, leaving the other three potential bases of liability to resolve at trial.

B. Trial

1. Expert Witness Testimony

a. Dalton
¶ 36 The Utilities' expert, "hydrogeologist environmental consultant" Matthew Dalton, *1124 concluded that DOT's "[DA-1 Line French drains] w[ere] the primary source of the contamination or the source of the increase in the PAH[s]" in the Waterway.[70] Dalton compared the concentrations of Waterway PAH levels in the mid 1980s, the mid 1990s, and 2008: The Waterway PAH level increased between the mid 1980s to 1990s (the time frame in which DOT installed the DA-1 Line French drains) and then dropped by 2008 (after DOT severed the connection between the DA-1 Line French drains and the Waterway). Dalton estimated that the contamination from DA-1 Line French drains was responsible for between 22.5 percent to 68.6 percent of the increase in Waterway PAH levels between the mid 1980s and mid 1990s. He "didn't feel that the[re] were other factors that could have significantly changed the concentrations so dramatically over that time period."[71] 3 VRP at 371.

b. Costa
¶ 37 DOT's expert witness, Helder Costa, used "three lines of evidence" to test the hypothesis that coal tar from the DA-1 Line French drains was the sole cause[72] of the increase in Waterway PAH levels: (1) weathering,[73] (2) temporal and regional trend analysis, and (3) source signature of fluoranthrene/pyrene ratios.[74] With respect to his first "line[] of evidence" having measured the LPAH to HPAH ratios of sediments throughout the Waterway before and after DOT installed the DA-1 Line French drains, Costa explained that the sediments all had lower LPAH to HPAH ratios (more weathering) before the installation of the DA-1 Line French drains than after.[75] He opined that it would be "implausible" that coal tar from the DA-1 Line French drains (a source with a high LPAH to HPAH ratio) could result in a lower net LPAH to HPAH ratio throughout the Waterway.[76] From this, Costa concluded that the Waterway contaminants had "more of a stormwater character [and] less of a coal tar character."[77] Costa further opined that this weathering analysis "[d]isprov[ed]" Dalton's testimony.[78]
¶ 38 With respect to his second "line[ ] of evidence," Costa showed that during the 1990's about the same level of magnitude increase in PAH levels occurred throughout the Waterway, including the mouth of the Waterway. According to Costa, this evidence *1125 "casts considerable doubt and opens up a host of questions" about "Dalton's explanation that the increase in [Waterway PAH levels] is due only to the contributions from the [DA-1 Line French drains]." 9 VRP at 1253-54.
¶ 39 Turning to his third "line of evidence[ ]," Costa explained that the ratio of fluoranthrene to pyrene (F/P ratio) is a ratio of one type of HPAH to another type of HPAH, which ratio also identifies different sources of HPAHs.[79] For example, "urban runoff" has a typical F/P ratio of 0.9 to 1.2.[80] Coal tar has a F/P ratio of 0.6 to 0.9. Costa's samples from the DA-1 Line French drains had an F/P ratio of 0.72 to 0.95. Thus, Costa opined that, in the Utilities' Work Area of the Waterway, both before and after DOT installed the DA-1 Line French drains, the sediments had a higher F/P ratio than those consistent with coal tar contamination.
¶ 40 But the F/P ratio before installation was lower than the F/P ratio after installation, which Costa explained was inconsistent with coal tar contamination from the DA-1 Line French drains. And, in the City Work Area of the Waterway, Costa noted that the sediment F/P ratios decreased after DOT installed the DA-1 Line French drains. According to Costa, if the DA-1 Line French drains were contaminating the Waterway, these ratios should have increased after the installation. Costa concluded that "the weight of evidence associated with the [F/P] ratio data . . . would generally disprove the. . . theory that the [DA-1 Line French drains] w[ere] the sole source of the [HPAH] increases [in the Waterway]."[81] Nevertheless, based on the reports he had read, Costa did not dispute that some PAH contaminants from the DA-1 Line French drains made their way through the intervening storm sewers and into the Waterway, as he would have expected.

C. Trial Court Decision
¶ 41 The trial court issued a memorandum opinion, (1) rendering judgment against DOT in favor of the Utilities for Waterway remediation costs, (2) granting the Utilities' request for a declaratory judgment that required DOT to contribute two percent of all future costs incurred by the Utilities in monitoring the Waterway remedy, and (3) awarding the Utilities reasonable attorney fees and costs.
¶ 42 In its Findings of Fact (FF), the trial court found that (1) "[DOT] ignored repeated requests from Ecology to stop the discharge of PAHs to the Waterway from the [DA-1 Line French drains] and also failed to respond to voicemail or email until Ecology `elevated' the request to higher management"[82]; (2) "[i]n March 2003, approximately 11 years after [DOT] found coal tar material was infiltrating the [DA-1 Line French drains], [DOT] completely severed the connection between the [DA-1 Line French drains] and [Tacoma's] storm sewer system"[83]; (3) "[DOT] unreasonably delayed implementing a solution to the releases from the [DA-1 Line French drains] to the Waterway,"[84] but Tacoma was also partially responsible for the delay; (4) "[a]n undetermined amount of PAHs was released into the Waterway from discharges from the [DA-1 Line French drains]"[85]; (5) "[DOT] caused releases of PAHs into the Waterway during SR 509 construction"[86]; and (6) the "[Utilities] and their assignors have incurred $116,153,162 in investigation and remediation costs on the Waterway . . . [of which Utilities] themselves incurred in excess of $15.4 *1126 [m]illion with respect to the investigation and remediation of their work area alone."[87]
¶ 43 The trial court also entered a separate section of findings of fact titled "[DOT]'s Recalcitrance," in which it found five specific facts reflecting DOT's refusal to participate in the Waterway cleanup:
1. Other than a contribution of $25,000 made to cleaning up the 22nd and "A" Street site, [DOT] refused to participate in or contribute to the funding of the investigation and remediation of the Waterway.
2. [DOT] was invited numerous times to participate and declined each time, claiming that the $5.3 million clean up during the I-705 project and the amounts spent on clean up during the SR 509 construction were its contribution.
3. [DOT's] decision to refuse to engage in negotiations with Ecology became a barrier for moving the cleanup project forward.
4. In order to get the [DA-1 Line French drains] removed from service, Ecology employees were forced to elevate the situation to upper management.
5. [DOT] engaged in persistent, uncooperative behavior with Ecology.
CP at 1835 (FF H.1-H.5).
¶ 44 In its Findings of Fact, the trial court ruled that the Utilities failed to meet their burden of proof for their contribution claim for the storm water retention pond and the vactor waste facility. The trial court also ruled, however, that DOT was liable for Waterway cleanup costs under the MTCA (1) as a current "owner or operator" of SR-509 and the DA-1 Line French drains, RCW 70.105D.040(1)(a); (2) as a past "owner or operator" of SR-509 and the DA-1 Line French drains, RCW 70.105D.040(1)(b); and (3) as an "arranger," RCW 70.105D.040(1)(c). See CP at 1838 (CL A.5, A.6, A.7, A.8).
¶ 45 Further ruling that the Utilities had "incurred remedial action costs," which they were entitled to recover from DOT, the trial court performed an "equitable allocation" to determine the amount of these costs, applied the six "Gore Factors"[88] and considered six other factors.[89] Applying the first Gore Factor, the trial court ruled that "there was some increase of PAHs caused by [DOT's] construction and operation of the [DA-1 Line French drains] and the construction of the SR-509 bridge project, but that [DOT] is not solely responsible for the total increase of PAHs in the Waterway."[90] Applying the second Gore Factor, the trial court ruled that, although "there is very little credible evidence in this regard," "[DOT] discharged enough PAH contamination into the Waterway to effect the total concentration of PAHs in the Waterway and to require that remedial action costs be incurred."[91] Applying the third Gore Factor, the trial court ruled that "there is no dispute that the PAHs are highly toxic."[92]
¶ 46 Applying the fourth Gore Factor, the trial court ruled that (1) "[DOT] did not generate the hazardous substance"; (2) "[DOT] did not intentionally transport this waste, but attempted to manage the hazardous substance as a result of encountering it during construction projects"; (3) "[DOT] knew that the [DA-1 Line French drains] w[ere] an ongoing method of transport of hazardous substance to the Waterway and failed to act upon their knowledge"; (4) "[DOT] built the SR 509 bridge in a[n] environmentally sensitive way . . . considering the highly contaminated soil of the construction site"; and (5) "[Tacoma] contributed to the delay in eliminating the [DA-1 Line French drains]." CP at 1841 (CL B.5.a-e).
*1127 ¶ 47 Applying the fifth Gore Factor, the trial court ruled that (1) DOT exercised a "high" degree of care undertaking the SR-509 construction[93]; (2) DOT "failed to conduct an appropriate site investigation [during the construction of I-705]" but "work[ed] cooperatively with Ecology to clean up the I-705 site to the extent both agencies felt was warranted"[94]; but (3) "[a]fter installing the [DA-1 Line French drains], [DOT] delayed taking actions necessary to stop the discharge of hazardous substances into the Waterway to the point of nearly delaying the remedy of the Waterway."[95] Applying the sixth Gore Factor, the trial court ruled that "[DOT] shirked its responsibility in many regards," "demonstrated very little cooperation with any other agencies to prevent the harm," "ignored facts as well as phone calls and chose to fight any notion of responsibility rather than work cooperatively to stop the discharge of hazardous substances from the [DA-1 Line French drains] into the Waterway."[96]
¶ 48 The trial court considered the following additional factors: (1) "the cost of the remedy for the entire Waterway"; (2) "the cost of clean-up related attorneys fees"; (3) "the Department of Natural Resources settlement provided to [the Utilities] and their assignors"; (4) "Ecology grants provided to [Tacoma]"; (5) "the reimbursements to [Tacoma] from its insurance carriers and from Burlington Northern Santa Fe Railway"; and (6) "the insurance recoveries received by [the Utilities] related to their respective environmental liabilities and the costs incurred by [the Utilities] related to their respective environmental liabilities." CP at 1842-43 (CL B.9.a-f).
¶ 49 The trial court entered judgment in favor of the Utilities against DOT for $6 million; entered a declaratory judgment against DOT for 2 percent "of all future costs incurred by [the Utilities] in monitoring and maintaining the Waterway remedy"; and awarded the Utilities $1,613,737.94 in attorney fees and costs.[97] DOT appeals.

ANALYSIS
¶ 50 DOT argues that the trial court erred by ruling it liable under Washington's Model Toxics Control Act (MTCA) and in its equitable allocation of remedial costs against DOT. These arguments fail.
¶ 51 For a party to obtain contribution from another party under the MTCA, the trial court must find the losing party liable under the MTCA and equitably allocate remediation costs against the losing party in favor of the prevailing party by answering two questions: "First, is [the party] liable under RCW 70.105D.040? If the answer is yes, then what portion of the cleanup costs should be allocated to [that party]?" Seattle City Light, et al. v. Wash. State Dep't of Transp., 98 Wash.App. 165, 170, 989 P.2d 1164 (1999). Here, the trial court properly ruled against DOT on both grounds.

I. Liability
¶ 52 DOT presents four rationales to support its argument that the trial court erred by ruling it liable under the MTCA: (1) the expert testimony purportedly established that storm water,[98] not coal tar, caused the changes in the Waterway's PAH levels; (2) the record allegedly lacks substantial evidence to support the trial court's finding that the SR-509 construction released PAHs into the Waterway[99]; (3) DOT is not liable under *1128 the MTCA as a matter of law because the trial court erred by applying certain liability provisions; and (4) the MTCA's "utmost care" exception to liability precludes it (DOT) from liability for PAH releases associated with the SR-509 construction. Br. of Appellant at 30. All four of these arguments fail.

A. Model Toxics Control Act Liability Provisions
¶ 53 The MTCA's declared policy is to hold parties accountable for "irresponsible use and disposal of hazardous substances." See RCW 70.105D.010(2). Our legislature "heavily patterned" Washington's MTCA after the federal Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), 42 U.S.C.A. §§ 9601-75. Taliesen Corp. v. Razore Land Co., 135 Wash.App. 106, 127, 144 P.3d 1185 (2006). Each liable party "is strictly liable, jointly and severally, for all remedial action costs and for all natural resource damages resulting from the releases or threatened releases of hazardous substances." RCW 70.105D.040(2). The MTCA authorizes Ecology to order "potentially liable [parties]" to "provide the remedial action" for release of a hazardous substance. RCW 70.105D.050(1); former RCW 70.105D.020(3) (2007). Failure to cooperate with an order from Ecology may result in civil penalties. RCW 70.105D.050(1)(a), (b).
¶ 54 Under RCW 70.105D.040, there are at least five ways a party can be liable under the MTCA:
¶ 55 (1) as an "owner or operator" of a "facility," under RCW 70.105D.040(1)(a) (current owner liability);
¶ 56 (2) as a "person who owned or operated the facility at the time of disposal or release of the hazardous substances," under RCW 70.105D.040(1)(b) (past owner liability);
¶ 57 (3) as a "person who owned or possessed a hazardous substance and who . . . arranged for disposal or treatment of the hazardous substances at the facility," under RCW 70.105D.040(1)(c) (arranger liability);
¶ 58 (4) as a "person[ ] who accepts or accepted any hazardous substance for transport to a disposal, treatment, or other facility. . . unless such facility . . . could legally receive such substance," under RCW 70.105D.040(1)(d)(i) (transporter liability);
¶ 59 or (5) as a "person who both sells a hazardous substance and is responsible for written instructions for its use," under RCW 70.105D.040(1)(e) (seller liability). Notably, "[l]ike CERCLA, no minimum level of `hazardous substances' is required to trigger MTCA liability." Seattle City Light, 98 Wash.App. at 172, 989 P.2d 1164 (citing A & W Smelter & Refiners, Inc. v. Clinton, 146 F.3d 1107, 1110-11 (9th Cir.1998)).

B. Storm-Water-Caused Change in Waterway PAH Levels
¶ 60 DOT first argues that it is not liable under the MTCA in fact because expert testimony established that storm water, not coal tar from the DA-1 Line French drains, caused the changes in the Waterway PAH levels.[100] Granting DOT partial summary *1129 judgment, the trial court ruled that DOT was not liable under the MTCA for hazardous substances from State highway storm water runoff. This ruling, however, does not absolve DOT of liability because there is sufficient evidence establishing that coal tar from the DA-1 Line French drains caused at least some of the increase in PAH levels in the Waterway.
¶ 61 Whether storm water, rather than coal tar, contributed exclusively to the change in Waterway PAH levels is a question of fact, which we review under the substantial evidence standard. Substantial evidence is "evidence that would persuade a fair-minded person of the truth of the statement asserted." Cingular Wireless, LLC v. Thurston County, 131 Wash.App. 756, 768, 129 P.3d 300 (2006).
¶ 62 DOT's arguments fail, primarily because they ignore our holding that "no minimum level of hazardous substance is required to trigger MTCA liability." Seattle City Light, 98 Wash.App. at 172, 989 P.2d 1164 (internal quotation marks omitted). For DOT to show that it is not liable under the MTCA based on its ownership and operation of the DA-1 Line French drains, then the evidence must show that DA-1 Line French drain coal tar was not responsible for any of the increase in Waterway PAH levels. But as Seattle City Light establishes, if the evidence shows that coal tar from the DA-1 Line French drains had some effect (no matter how small) on Waterway PAH levels, then DOT is liable under the MTCA, provided the DOT falls within a definition of an applicable liability provision. See Seattle City Light, 98 Wash.App. at 172, 989 P.2d 1164.
¶ 63 Not even Costa's testimony established that coal tar from the DA-1 Line French drains had no impact on the Waterway PAH levels; rather Costa's testimony showed only that DA-1 Line French drain coal tar did not have a substantial impact. Costa himself "d[idn't] dispute" that materials from the Site area "got into the [DA-1 Line French drains]" and "ultimately ended up passing . . . into the . . . Waterway."[101] And, as DOT correctly notes, "[Costa] never testified that the [DA-1 Line French drains] w[ere] not the cause of PAH contamination to the Waterway." Br. of Resp't at 47. Furthermore, Costa admitted that he was "not comfortable" stating that the "regional trend" of HPAH contamination increase "was sufficient to disprove" the Utilities' theory that coal tar from the DA-1 Line French drains contributed at least somewhat to changes in Waterway PAH levels.[102] And, although Costa's weathering evidence showed that the Waterway contamination had "more of a stormwater character, less of a coal tar character," the evidence did not establish that the contamination had no coal tar character whatsoever.[103]
¶ 64 Similarly, the F/P ratio evidence showed only "a predominant stormwater influence," not an exclusive storm water influence.[104] Thus, the F/P ratio evidence disproved only "the theory that the [DA-1 Line French drains] w[ere] the sole source of the [HPAH increases in the Waterway]."[105] But the Utilities did not argue that coal tar from the DA-1 Line French drains was the only source of increases in PAH Waterway levels; nor, under the MTCA, did they need to make such an argument. On the contrary, as we have already noted, it was sufficient that the Utilities provided evidence that the DOT sources contributed part of the contamination:[106] DOT's own evidence established DOT constructed, owned, and operated the *1130 DA-1 Line French drains, in which coal tar came to be located and played at least some role in contaminating and increasing Waterway PAH levels. Accordingly, the trial court did not err in ruling that DOT was liable under the MTCA for its ownership and operation of the DA-1 Line French drains and their contribution to the Waterway contamination.

C. SR-509 Construction
¶ 65 DOT next argues that the record lacks substantial evidence to support the trial court's finding that the SR-509 construction released PAHs into the Waterway. Several parts of the record establish otherwise. DOT's argument fails.
¶ 66 Whether DOT's construction of SR-509 caused change in Waterway HPAH levels is a question of fact, which, again, we review under the substantial evidence standard. DOT argues that (1) only two witnesses were present during the SR-509 construction and neither testified that the construction caused the release of hazardous substances into the Waterway; and (2) Utilities' expert witness Dalton "speculated" about such releases "but admitted he lacked personal knowledge" about the releases. Br. of Appellant at 29. The Utilities counter that substantial evidence supports the trial court's finding that the SR-509 construction released PAHs into the Waterway because DOT's SR-509 construction activities caused the release of PAHs.[107] The Utilities' argument prevails.
¶ 67 Ecology employee Marv Coleman had been present during "most" of the SR-509 construction and had witnessed DOT's installing foundations and piers and "dig[ging] up part of the existing DA-1 line."[108] He had also observed "liquid tar" and groundwater pouring out from this dig, dirt from which DOT used to cover the MH792 manhole that eventually connected to the Waterway.[109] Dean Moberg[110] testified that the machinery used during the SR-509 construction leaked oil.
¶ 68 The following entries from DOT construction diaries provide additional evidence of leakage from the DOT construction site:
June 30, 1995:
"Gave Terry Redd copies of photo of job site that shows environmental errors-leaking fuel on docks, leaking oil drums, improperly stored fuel, etc."
CP at 361.
July 6, 1995:
"Arrived on site @ 0900. No diapers under equipment. Fuel, oil [and] air filters thrown on ground near compressors after maintenance. I got out of truck to take photo[graph]s. Camera died. As soon as operators saw me trying to take [pictures], they hopped out of [the] crane [and] put diapers under equip[ment]., etc."
CP at 353.
July 13, 1995:
"Contractor had leaking equipment in west end work dock (over water area). The crane had no diapers underneath, [and] there was a puddle of oil about the size of a dinner plate under it. The compressor was dripping oil, too."
CP at 363.
¶ 69 Similarly, a June 9, 2004 environmental consultants' "Remedial Action Construction Report" on behalf of the Utilities (Construction Report) (1) noted that a "SR-509 seep appears to have started sometime during the construction of the SR-509 Bridge" and (2) detailed DOT construction methods that led to the SR-509 seep:
Pulling of timber piles to remove floats associated with [a former marina located in the Waterway] and the installation of false work piles to support bridge construction. . . may . . . have opened preferential *1131 pathways for release of the previously contained contaminants.
CP at 672-73. Similarly, a June 14, 2000 report and a September 12, 2000 "Technical Memorandum"[111] also explained that the SR-509 bridge construction "caused a preferential pathway for upward migration" of contaminants. CP at 1137.
¶ 70 The record contains sufficient facts to "persuade a fair-minded person" that DOT's SR-509 construction released hazardous substances that contributed to the adverse changes in Waterway PAH levels. Cingular Wireless, 131 Wash.App. at 768, 129 P.3d 300. Accordingly, we hold that the trial court did not err in finding that the SR-509 construction contributed to the changes in Waterway PAH levels.

D. MTCA Liability
¶ 71 Third, DOT argues that it is not liable under the MTCA as a matter of law because the trial court erred by concluding that DOT was liable as a past "owner" (RCW 70.105D.010(1)(a)), as a current "owner" (RCW 70.105D.040(1)(b)), and as an "arrang[er]" (RCW 70.105D.040(1)(c)) under the MTCA. These arguments fail. "Whether a statute applies to a factual situation is a question of law,"[112] which we review de novo. Quality Rock Products, Inc. v. Thurston County, 139 Wash.App. 125, 133, 159 P.3d 1 (2007). We affirm the trial court's partial summary judgment ruling that DOT is liable to the Utilities as an "arrang[er]" under RCW 70.105D.040(1)(c).[113]
¶ 72 Under the MTCA, an "arrang[er]" is:
Any person who owned or possessed a hazardous substance and[:] [1] who by contract, agreement, or otherwise arranged for disposal or treatment of the hazardous substance at the facility, or [2] arranged with a transporter for transport for disposal or treatment of the hazardous substances at the facility, or [3] otherwise generated hazardous wastes disposed of or treated at the facility.
RCW 70.105D.040(1)(c) (emphasis added). DOT reads the United States Supreme Court's decision[114] in Burlington Northern and Santa Fe Railway v. United States[115] as imputing an intent element into MTCA "arranger" liability and then argues that, because the Utilities did not establish that DOT "intended" to dispose of hazardous substances, it is not liable as an "arranger" under RCW 70.105D.040(1)(c).[116] Br. of Appellant at 23. The Utilities respond that "arranger" liability under the MTCA does not include an intent element and, even if it did, DOT had sufficient intent. Br. of Resp't at 27. Again, DOT's argument fails.
¶ 73 DOT's reliance on Burlington Northern is misplaced. Although Burlington Northern requires an intent element for "arranger" liability under 42 U.S.C.A. § 9607, *1132 see 129 S.Ct. at 1880, our state courts have interpreted "arranger" liability under the state MTCA not to require this element. The United States Supreme Court's interpretation of CERCLA does not trump our state courts' interpretation of Washington's comparable Act. "[O]ur interpretation of our statutes is binding on the federal courts, not theirs on us." Von Herberg v. City of Seattle, 157 Wash. 141, 160, 288 P. 646 (1930). As the Utilities correctly point out, both we and Division One of our court have held that the MTCA's "arranger" liability provision "does not require a plaintiff to prove that the defendant had the specific intent to dispose of a hazardous substance." Seattle City Light, 98 Wash.App. at 173, 989 P.2d 1164.[117] We hold that the trial court did not err in concluding that DOT is liable for "arranger" liability under RCW 70.105D.040(1)(c).

II. Allocation of Cleanup Costs
¶ 74 Having affirmed DOT's liability for Waterway contamination under the MTCA, we next address DOT's arguments that the trial court improperly allocated cleanup costs to DOT. DOT first argues that the trial court erred by allocating contribution costs to DOT without first determining DOT's "fractional share of responsibility" and whether "[DOT's] release created or significantly contributed to a threat to human health."[118] Br. of Appellant at 44. Second, DOT contends that the trial court erred by making certain findings regarding DOT's "recalcitran[ce]" (DOT's lack of cooperation with the Utilities and other entities involved in the cleanup costs) and then using these findings as a factor in its equitable cost-contribution analysis. Br. of Appellant at 48. Third, DOT asserts that the trial court erred by allocating costs to DOT without "set[ting] out how the [trial] court arrived at that number." Br. of Appellant at 50-51. Fourth and finally, DOT argues that the trial court erred by allocating costs without first finding the Utilities' share of the Waterway cleanup costs, the amount that the Utilities actually spent in excess of that share, and the amount that third party payments offset those excess costs.[119] These arguments also fail.

A. MTCA Cost-Allocation Provision
¶ 75 A party liable under the MTCA may bring a "private right of action, including a claim for contribution or for declaratory relief, against any other person liable under [the MTCA] for the recovery of remedial action costs" provided that the remedial action is "the substantial equivalent of a[n] [Ecology]-conducted or [Ecology]-supervised remedial action." RCW 70.105D.080. Recovery under these private rights of action "shall be based on such equitable factors as the court determines are appropriate." RCW 70.105D.080.[120] The MTCA, however, does not specify these equitable factors.
¶ 76 Here, the trial court applied the "Gore factors"[121] and other "additional factors." CP at 1840, 1842. The Gore factors are:
(i) the ability of the parties to demonstrate that their contribution to a discharge, release or disposal of a hazardous waste can be distinguished;
(ii) the amount of the hazardous waste involved;
(iii) the degree of toxicity of the hazardous waste involved;

*1133 (iv) the degree of involvement by the parties in the generation, transportation, treatment, storage, or disposal of the hazardous waste;
(v) the degree of care exercised by the parties with respect to the hazardous waste concerned, taking into account the characteristics of such hazardous waste; and
(vi) the degree of cooperation by the parties with Federal, State or local officials to prevent any harm to the public health or the environment.
ENSCO, 969 F.2d at 508 (citing A & F Materials, 578 F.Supp. at 1256). As the Seventh Circuit Court of Appeals explained in ENSCO, "[I]n any given case, a court may consider several factors, a few factors, or only one determining factor . . . depending on the totality of circumstances presented to the court." ENSCO, 969 F.2d at 509.
¶ 77 At least two of our state courts have discussed the Gore Factors, simply noting, however, only that the federal courts employ these factors. Seattle City Light, 98 Wash.App. at 175-76 n. 8, 989 P.2d 1164; Dash Point Village Assoc. v. Exxon Corp., 86 Wash.App. 596, 607 n. 24, 937 P.2d 1148 (1997). Although our courts have not explicitly adopted the Gore Factors, the parties do not dispute the trial court's use of them here. Furthermore, trial courts are not limited to the Gore Factors.[122] Thus, we cannot say that the trial court improperly considered the Gore Factors and "additional factors" in its equitable cost-contribution analysis. CP at 1842.

B. Absence of "Fractional Share" and "Health Threat" Findings[123]
¶ 78 As other courts recognized, the MTCA does not require the trial court to find a fractional share of responsibility for the contamination before apportioning contribution costs. Division One of our court has held that a trial court's determination of contributory cost allocation under RCW 70.105D.080 is an application of equity that appellate courts review for abuse of discretion.[124]See Taliesen, 135 Wash.App. at 139, 144 P.3d 1185 (citing In re Yakima River Drainage Basin, 112 Wash.App. 729, 748, 51 P.3d 800 (2002)). We adopt this standard here and find no abuse of discretion by the trial court.

1. "Fractional Share"
¶ 79 The MCTA does not require trial courts to apportion contribution costs based on the relative amounts that liable parties contributed to the contamination. For example, in Taliesen, Division One reviewed a trial court's decision to apportion 50 percent of cleanup costs to an environmental consultant, 45 percent to the current property owner (who had contracted with the environmental consultant), and 5 percent to the former property owner. Taliesen, 135 Wash.App. at 117-18, 144 P.3d 1185. The trial court ordered the environmental consultant and the current property owner to share future remediation costs "50/50." Taliesen, 135 Wash.App. at 117, 144 P.3d 1185. Division One (1) rejected the current property owner's argument that, because the current property owner "played no part in generating the contamination" and "its own conduct was not that egregious," the trial court abused its discretion in its allocation; and (2) explained instead that the trial court has "discretion to allocate liability based on equitable factors as the court considers appropriate" and may consider such factors as the "moral[ ]" culpability of "fail[ing] to comply with public notification requirements." Taliesen, 135 Wash.App. at 139-41, 144 P.3d 1185. Taliesen did not require the trial *1134 court to consider the quantity of hazardous substances a party released before the trial court allocated costs under RCW 70.105D.080; and we do not require it here.
¶ 80 Similarly, in Car Wash Enter., Inc. v. Kampanos, 74 Wash.App. 537, 539, 874 P.2d 868 (1994), the defendant owned property for 15 years, during six years of which he operated a gas station. The plaintiff successor owner of the property brought an MCTA contribution claim against the defendant, whom the trial court ruled had contributed "seven-elevenths of the clean up costs . . . based on the number of years a gas station had been in operation during [the defendant's] ownership." Kampanos, 74 Wash. App. at 540-41, 874 P.2d 868. On appeal, Division One disagreed with the defendant's argument that trial court had "misapplied" the Act's equitable factors and held that "the trial court's approach was correct" because it "t[ook] into account both the cause of the contamination, i.e., the underground gasoline tanks, and [the defendant's] relationship to the cause of contamination." Kampanos, 74 Wash.App. at 548, 874 P.2d 868. Neither the Kampanos nor the Taliesen courts required the trial court to determine the quantity of hazardous substances that the defendant had released before holding him liable for and requiring him to pay contribution costs. Here, we hold that the trial court did not err in similarly ruling DOT liable for contribution costs without first determining the amount of contamination that DOT had released into the Waterway.[125]

2. "Health Threat"
¶ 81 DOT also argues that (1) the MCTA required the trial court, before determining contribution costs, to find whether DOT's release of hazardous substances contributed to a threat or potential threat to human health or to the environment; and (2) therefore, the trial court erred by imposing contribution costs against DOT without "finding that [DOT's] release created or significantly contributed to a threat to human health." Br. of Appellant at 45. Again, DOT is incorrect.
¶ 82 The trial court defined HPAHs (which the trial court determined DOT released into the Waterway) as a "hazardous substance[ ]" under former RCW 70.105D.020(7)(2007).[126] "Hazardous substances" include "[a]ny substance or category of substances . . . determined by the [D]irector [of Ecology] by rule to present a threat to human health or the environment if released into the environment." Former RCW 70.105D.020(7)(e) (2007).

C. Recalcitrance
¶ 83 The trial court entitled an entire section of its findings of facts "[DOT]'s Recalcitrance."[127] DOT argues that "[m]any of the [trial] court's findings of fact regarding this issue are not supported by the evidence, or reflect an incomplete picture of the evidence,"[128] including: (1) "[DOT] ignored repeated requests from Ecology to stop the discharge of PAHs to the Waterway from the [DA1 Line French drains] and also failed to respond to voicemail or email until Ecology `elevated' the request to higher management"[129]; (2) "[i]n order to get the [DA-1 *1135 Line French drains] removed from service, Ecology employees were forced to elevate the situation to upper management"[130]; (3) "[DOT] unreasonably delayed implementing a solution to the releases from the [DA-1 Line French drains] to the Waterway"[131]; and (4) "[i]n March 2003, approximately 11 years after [DOT] found coal tar material was infiltrating the [DA-1 Line French drains], [DOT] completely severed the connection between the DA-1 line and [Tacoma's] storm sewer system."[132] In response, the Utilities point to evidence of DOT's recalcitrance that support the trial court's findings fact, which, again, we review for substantial supporting evidence. DOT's arguments fail.
¶ 84 The first three findings that DOT challenges concern the lack of DOT's cooperation with other entities involved in the Waterway cleanup. Substantial evidence supports all three findings. Coleman testified that, by 1995, "[Ecology] hadn't had a lot of luck getting [DOT] to do anything about improving the state of the [DA-1 Line French drains] that had been installed back in the mid 80's to try to fix that problem."[133] In a memorandum to colleagues, Coleman stated:
[Tacoma] and Ecology had been trying to get [DOT] to find a manhole near SR-705 that they had either paved over or covered with landscaping. It was necessary to find the manhole to video the inside of a storm water pipe going to [the Waterway]. [DOT] did not respond to this need for a long period of time (I don't remember how long, exactly; I think it was at least a couple of years.) We finally found it with a magnetometer . . . . This particular case is typical of much of the experience we have with [DOT]: They are first of all not responsive to requests for information or actions for which they are responsible. Secondly, in cases where there are questions regarding how or where something was constructed they often claim to not have a record or (more commonly) their as-built records do not accurately reflect what was actually constructed.
CP at 196.
¶ 85 Kristine Flint, a 26-year-EPA employee who works on Superfund sites, including the Waterway, testified, "It was very difficult to work with DOT. They tended to not come to meetings when they were invited, sometimes when they said they would attend."[134] In an email to another EPA employee, Lori Cohen, Flint stated, "[DOT] steadfastly continues to avoid responsibility for any of their work that coincides with MTCA, CERCLA, or other environmentally sensitive sites managed by Ecology, EPA, or other local authorities."[135] And at trial, Flint testified:
[T]he deadline . . . for source control completion for the head of the [W]aterway was 2003. . . . We were looking to have that milestone, that source control milestone, achieved in March of 2003. It wasn't until the middle of March that [DOT] managed to get out there and get the problem addressed. This is after three years of promising to come to meetings and not making them all, . . . making dates to go in field with [Tacoma] and then not making the date, and it had been one delay after another without a lot of good explanation, and it was extremely tense because that was a major milestone for us for any of us to go forward with remediation of the [W]aterway.
5 VRP at 748-49.
¶ 86 An email among Flint, her EPA superiors, and Coleman stated that (1) Coleman was going to alert his managers at Ecology "to resolve the problem" of DOT's lack of cooperation; and (2) Coleman planned to "physically visit" DOT's office "in an attempt to speak with Jeff Sawyer about the penalties [DOT] will likely [in]cur unless the DA-1 correction is performed," such as "penalty action under the order or a ticket for non-compliance."[136] *1136 Flint also testified that she felt it was necessary to report DOT's lack of compliance to her superiors at the EPA. We hold that substantial evidence supports the trial court's first three recalcitrance-related findings.
¶ 87 The fourth finding that DOT challenges reads, "In March 2003, approximately 11 years after [DOT] found coal tar material was infiltrating the DA-1 line, [DOT] completely severed the connection between the [DA-1 Line French Drains] and [Tacoma's] storm sewer system."[137] Substantial evidence also supports this finding. Ecology detected coal tar material in the [DA-1 Line French drains] in 1992; in March 2003, DOT cut the connection between the DA-1 Line French drains and Tacoma's the storm drain system.
¶ 88 As part of its Gore Factor analysis, the trial court ruled:
Regarding the sixth [Gore] factor, the degree of cooperation by the parties with Federal, State or local officials to prevent any harm to the public health or the environment, [DOT] shirked its responsibility in many regards. [DOT] demonstrated very little cooperation with any other agencies to prevent the harm. [DOT] ignored facts as well as phone calls and chose to fight any notion of responsibility rather than work cooperatively to stop the discharge of hazardous substances from the [DA-1 Line French drains] into the Waterway.
CP at 1842 (FF B.7). The sixth Gore Factor is "the degree of cooperation by the parties with Federal, State or local officials to prevent any harm to the public health or the environment." ENSCO, 969 F.2d at 508. Given the wide latitude that trial courts have to select the equitable factors (including the Gore Factors) to use in its analysis and the fact that DOT does not challenge the trial court's choice of equitable factors, DOT's only potentially viable argument is that the trial court abused its discretion in determining that DOT's conduct triggered application of the sixth Gore Factor. But as we have already explained, substantial evidence supports the trial court's findings that DOT did not cooperate with Waterway cleanup efforts. Thus, we hold that the trial court did not abuse its discretion in applying the sixth Gore Factor here.

D. No Explanation of Cost Allocation Figures
¶ 89 DOT argues that the trial court erred by awarding the Utilities $6 million in cleanup costs because the trial court "did not set out how [it] arrived at that number." Br. of Appellant at 50. Because this argument challenges the trial court's equitable allocation of contribution costs, we review this argument under the abuse of discretion standard. Taliesen, 135 Wash.App. at 139, 144 P.3d 1185. Again, DOT's argument fails.
¶ 90 Under the MCTA, "a person may bring . . . a claim for contribution . . . against any other person liable under RCW 70.105D.040 for the recovery of remedial action costs. . . . Recovery shall be based on such equitable factors as the court determines are appropriate." RCW 70.105D.080 (emphasis added). The MCTA expressly provides that the trial court determines the amount of contribution costs by considering equitable factors; the MCTA does not require precise calculations. RCW 70.105D.080. The trial court thoroughly explained its analysis of the six Gore Factors, as well as its use of additional factors. Thus, DOT cannot show that the trial court failed to articulate the reasoning behind its allocation of contribution costs; instead, DOT's argument articulates only its dissatisfaction with the trial court's reasoning. We hold that the trial court's reasoning was consistent with the MTCA.

E. Excess Costs
¶ 91 Finally, DOT argues that the trial court erred by allocating contribution costs without first finding: (1) the Utilities' own share of cleanup costs; (2) the amount that the Utilities spent in excess of their own share; and (3) the amount that third party *1137 payments offset those excess costs.[138] Again, we review this argument under the abuse of discretion standard. Taliesen, 135 Wash. App. at 139, 144 P.3d 1185. DOT's argument fails.
¶ 92 As we explain above, the amount of costs that one liable party must contribute to another liable party under the MTCA depends on "equitable assessments." Seattle City Light, 98 Wash.App. at 175, 989 P.2d 1164 (citation omitted). In this equity analysis, the "quantity and relative toxicity of a hazardous substance" that a liable party releases is "relevant"; but "[i]n many cases (if not most), it is extremely difficult to dissect the waste and associated cleanup costs." Seattle City Light, 98 Wash.App. at 175-76, 989 P.2d 1164 (footnote omitted). As other courts have recognized, because of this complexity in environmental liability cases, the MTCA does not require the trial court first to quantify precisely the amount and relative toxicity of the hazardous substances that each party releases, and then to quantify the associated cleanup costs of those specific substances.[139]
¶ 93 Among various equitable factors, the trial court considered "the [DNR] settlement provided to [the Utilities] and their assignors" and "the insurance recoveries received by [the Utilities]."[140] Thus, the record does not support DOT's contention that the trial court did not consider insurance reimbursements in its award calculations. The record also contains stipulations that (1) the DNR contributed $3.7 million to Waterway remediation costs; (2) Ecology, through grants, reimbursed Tacoma for $24.7 million in Waterway remediation costs; and (3) Tacoma's insurers reimbursed[141] Tacoma for $11,857,102 of Tacoma's Waterway costs.
¶ 94 In addition, the Utilities presented evidence that Puget Sound Energy places all of its recovery funds, including payments from insurance companies, into "one bucket"[142] and that Puget Sound Energy "applie[s]" the bucket funds "to all existing and unknown [environmental cleanup] sites associated with [Puget Sound Energy's] historic operations."[143] At the time of trial, the sum of Puget Sound Energy's accumulated costs and estimated future costs was approximately $48.8 million more than the total amount that Puget Sound Energy had recovered from insurance companies.[144] PERCO also submitted evidence showing that, for "a number of environmental remediation sites" (including the Waterway), it had incurred nearly *1138 $12 million more in costs than it had received in insurance settlements or payments[145]. We hold that the trial court did not abuse its discretion in allocating contribution costs to DOT.

III. Attorney Fees and Costs
¶ 95 We affirm the trial court's award of attorney fees and costs to the Utilities. We also award the Utilities attorney fees and costs on appeal under RCW 70.105D.080.
¶ 96 We affirm.
We concur: PENOYAR, C.J., and JOHANSON, J.
NOTES
[1] A "French drain" is "an underground passage made by filling a trench with loose stones and covering with earth." Webster's Third International Dictionary 908 (1969).
[2] "The Thea Foss Waterway (previously known as the `City Waterway') is one of seven finger inlets located off Commencement Bay at the southern end of the main basin of Puget Sound.... The waterway extends north to south along approximately 1.5 miles of the downtown shoreline of the City of Tacoma, Pierce County, Washington." CP at 668.
[3] The production of coal gas involves heating coal to a temperature of over 2,000 degrees Fahrenheit, which creates coal tar as a waste byproduct.
[4] Washington Gas & Electric Company is the corporate predecessor of Washington Natural Gas Company. In 1997, Washington Natural Gas Company merged with Puget Power, becoming one entity, Puget Sound Energy.
[5] CP at 757.
[6] DOT removed "[p]ortions of the coal tar and contaminated soils, encountered during excavating activities" from the construction area around I-705, shipped the contaminated soil to Arlington, Oregon, and placed other soil in an underground vault. CP at 798.
[7] In 1992, seeking reimbursement for these cleanup costs, DOT filed a complaint under the federal Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), 42 U.S.C.A. sections 9601-75, against Washington Natural Gas Company, PacifiCorp, and Advance Ross Corporation (a successor corporation to a company that operated the Plant from 1909 until at least 1919). The federal district court ruled that the three defendants were liable but dismissed DOT's claim because DOT itself "ignor[ed] [CERCLA] regulations and time consuming `red tape'" in its performance of cleanup operations during I-705 construction. CP at 1549. See also Wash. Dep't of Transp. v. Wash. Natural Gas Co., 36 Env't Rep. Cas. (BNA) 1045 (W.D.Wash.1992), aff'd, 51 F.3d 1489, superseded on recons., 59 F.3d 793 (9th Cir.1995).
[8] CP at 141; CP at 2011; 8 VRP at 1140.
[9] CP at 141; 4 VRP at 645.
[10] An outfall is a "place[] where flowing water leaves the highway and enters" a body of natural water. CP at 1197.
[11] CP at 50.
[12] "PAHs" "are airborne by-products of incomplete combustion that come from such sources as automobile exhausts, fireplaces and industry." CP at 919.
[13] "SQOs are chemical performance standards. . . that apply to cleanup of surface sediment . . . They are scientifically acceptable definitions of the sediment quality goal of no adverse biological effects." CP at 681.
[14] CP at 64.
[15] CP at 50.
[16] Outfall 237A drains into the Waterway.
[17] CP at 141.
[18] CP at 141.
[19] 4 VRP at 646.
[20] CP at 142.
[21] 5 VRP at 703.
[22] CP at 778.
[23] CP at 148.
[24] 5 VRP at 693.
[25] Manhole MH792 connected to a corrugated metal pipe, which connected to another manhole and then to the 237-A west outfall, which drained into the Waterway and the 237-B east outfall.
[26] At a later time, Ecology uncovered the MH792 manhole and discovered "tar-like materials and sheens" in the manhole. 5 VRP at 697.
[27] CP at 459.
[28] 5 VRP at 686.
[29] According to Puget Sound Energy, "vactor waste" is "the waste that comes out of storm drains, gets sucked out of storm drains by vactor trucks, big vacuum trucks that pull water and sludge out of the storm lines." VRP (Oct. 21, 2008) at 21.
[30] CP at 638.
[31] "[A]fter the restoration . . ., a previously unknown catch basin was discovered at the site" into which vactor waste run off was discharging. CP at 638.
[32] CP at 651.
[33] The National Priorities List is the EPA's compilation of hazardous-waste-contaminated sites that are leading candidates for investigation and cleanup under the federal Superfund program. CP at 2007 (citing Wash. State Dep't of Transp. v. U.S. Envtl. Prot. Agency, 286 U.S.App. D.C. 379, 917 F.2d 1309, 1310 (1990) (citing 42 U.S.C. § 9605(a)(8)(B))).
[34] CP at 651, 835.
[35] CP at 652.
[36] CP at 836.
[37] CP at 221.
[38] CP at 836.
[39] CP at 653.
[40] CP at 836.
[41] United States v. Atlantic Research Corp., 551 U.S. 128, 131-32, 127 S.Ct. 2331, 168 L.Ed.2d 28 (2007).
[42] At this time, the EPA had not determined that the Utilities were also "potentially liable parties" under CERCLA. 1 VRP at 131. Thus, the EPA had not contacted the Utilities about the Waterway contamination.
[43] CP at 654-55.
[44] 1 VRP at 131, CP at 1834.
[45] "Potentially liable parties" under the state MTCA are the state counterpart to "potentially responsible parties" under the federal CERCLA. RCW 70.105D.020(19); 1 VRP at 114. See also CP at 64.
[46] Advance Ross Corporation later assigned its recovery rights to PERCO.
[47] 4 VRP at 637.
[48] CP at 800.
[49] CP at 64.
[50] 1 VRP at 138.
[51] CP at 837.
[52] 1 VRP at 122.
[53] The Allocation Process Group comprised "the universe of people who had been ultimately contacted by EPA," which were the entities "that either had current or historical operation or ownership in and around the [Thea Foss Waterway]." 1 VRP at 139, 148.
[54] 1 VRP at 151.
[55] According to Intra-Participants Group cleanup study committee treasurer and Puget Sound Energy employee Steve Secrist, the estimated cost that the Allocation Process Group sought to fund was actually $160 million.
[56] 8 VRP at 1038.
[57] The Arbitrator estimated that the orphan parties were responsible for about $8.75 million of the cleanup costs. The EPA "for[gave]" about $7 million of this amount, which was subtracted from the amount that the parties participating in the Allocation Process Group had to contribute to cleanup costs. 8 VRP at 1060. And where there were no viable parties to undertake cleanup of "orphan sites," Ecology used State funding to undertake the cleanup. 5 VRP at 680. See also 8 VRP at 1038.
[58] 8 VRP at 1062.
[59] Later, Tacoma and the cashed-out parties transferred to the Utilities their rights to seek contribution for both past and future cleanup costs against any party that did not resolve its liability for remediating the Waterway contamination.
[60] 8 VRP at 1062.
[61] CP at 675.
[62] CP at 580.
[63] 8 VRP at 1118. Tacoma received a similar certification for its remedial construction work on the rest of the Waterway.
[64] More specifically the Utilities alleged that (1) "[t]he Waterway is a site where hazardous substances were deposited, disposed of, placed, or have otherwise come to be located"; (2) the hazardous substances included "petroleum and petroleum products, metals, heavy polynuclear aromatic hydrocarbons (PAHs), bis(2-ethylhexyl)phthalate and other phthalates, pesticides, roadway runoff, and solid waste decomposition products"; (3) DOT contributed to the contamination of the Waterway and "refused to participate in or contribute to the funding of the investigation and remediation of the Waterway"; and (4) they (Utilities) shouldered the cost of DOT's lack of cleanup efforts. CP at 4, 7.
[65] The Utilities asserted both their own claims for contribution and the contribution claims of those parties that assigned their rights to the Utilities.
[66] In response to the DOT's motion, the trial court struck the "transporter" liability argument from the Utilities' motion for partial summary judgment. CP at 1611.
[67] "This ruling established that [DOT] was liable for a release of hazardous substances, but did not establish whether that release caused remedial action costs." CP at 1829.
[68] According to DOT's expert witness, storm water contains PAHs from sources such as wood smoke, automobiles, and a wide variety of industrial sources.
[69] CP at 1719.
[70] 2 VRP at 289, 307.
[71] On cross-examination, Dalton admitted that, in a February 10, 1999 report, he had stated: "While coal tar materials may be present in the catch basins beneath A Street in pipe sediment[,] trap data from the municipal storm water system indicate little[ ] current impact from the DA-1 [L]ine area to [W]aterway sediments." 4 VRP at 489. The trial court found that Dalton's trial testimony "[wa]s a change from [his] opinion in 1999." CP at 1836. And, in a September 14, 2000 memo, Dalton had written: "`While the DA-1 [L]ine may have caused the release of oily material containing [PAHs] to the head of the [Waterway], the releases do not appear to have substantially impacted bottom sediment quality.'" 4 VRP at 534 (quoting Ex. 835).
[72] Costa set out to disprove this `sole-cause hypothesis,' but Dalton in fact never testified that coal tar from the DA-1 Line French drains was the exclusive cause of the increase in Waterway PAH levels. Instead, Dalton testified that the DA-1 Line French drains' coal tar was the primary cause. See 2 VRP at 307.
[73] Costa described the "weathering" process as follows: "As a result of exposure to environmental conditions, . . . smaller molecules . . . are more rapidly evaporated . . . and to a greater extent than larger molecules [of similar properties]." 10 VRP at 1369. Environmental conditions that cause weathering include exposure to air and light, temperature effects, and contact with water. Coal tar, which is "dominated" by smaller molecules (LPAHs), 10 VRP at 1369, would preserve these LPAHs in the DA-1 Line French drains because of this "relatively sheltered environment." 9 VRP at 1261. According to Costa, soil samples from the DA-1 Line French drains would experience less weathering and, therefore, have a higher LPAH to HPAH ratio than, for example, soil samples located on the banks of the Waterway that weathering had been affecting for over 80 years. Costa explained that the LPAH to HPAH ratio in soil borings taken underneath A Street near the DA-1 Line French drains was somewhere between 2.0 to 3.0, whereas a soil sample from the Waterway bank had a LPAH to HPAH ratio of 0.36.
[74] 9 VRP at 1254.
[75] 9 VRP at 1254.
[76] 9 VRP at 1206.
[77] 9 VRP at 1265.
[78] 9 VRP at 1262.
[79] 9 VRP at 1254.
[80] 9 VRP at 1209.
[81] 9 VRP at 1288 (emphasis added).
[82] CP at 1832 (FF C.11).
[83] CP at 1832 (FF C.12).
[84] CP at 1832 (FF C.15).
[85] CP at 1832 (FF C.14).
[86] CP at 1833 (FF D.4). In reviewing the expert testimony, the trial court noted that Dalton's and Costa's testimonies "illustrate[d] the difficulty in distinguishing various releases of hazardous substances into the Waterway," and concluded that "there was some increase of PAHs in the Waterway that were caused by [DOT]'s construction of [SR-509] and construction and operation of the [DA-1 Line French drains]" but that "[DOT] is not solely responsible for the total increase in PAHs in the Waterway." CP at 1837-38 (FF L.19, L.20) (emphasis added.)
[87] CP at 1835 (FF G.9).
[88] The "Gore Factors" derive their name from former Congressman and Vice President Albert Gore, Envtl. Transp. Sys., Inc. v. ENSCO, Inc., 969 F.2d 503, 508 (7th Cir.1992), who proposed these six factors as part of an amendment (which passed in the United States House of Representatives, but did not survive in the Senate) to the CERCLA. See Comprehensive Environmental Response, Compensation, and Liability Act of 1980, Pub.L. No. 96-510, 94 Stat. 2767; H.R. 7020, 96th Cong., 126 Cong. Rec. 26781 (Sept. 23, 1980) (proposed Gore amendment).
[89] CP at 1840.
[90] CP at 1841 (CL B.2).
[91] CP at 1841 (CL B.3).
[92] CP at 1841 (CL B.4).
[93] CP at 1842 (CL B.6).
[94] CP at 1842.
[95] CP at 1842 (CL B.6).
[96] CP at 1842 (CL B.7).
[97] CP at 1843.
[98] In its grant of partial summary judgment, the trial court ruled that DOT was not liable for changes in Waterway PAH levels caused by storm water.
[99] DOT also asserts, "[T]he trial court's findings that [DOT] caused a release of hazardous substances into the Waterway sediments and created the need for a cleanup are actually findings of ultimate fact paralleling the statutory elements" "are actually conclusions of law," which this court reviews de novo. Br. of Appellant at 41. DOT does not identify, however, to which specific "findings" it refers. Nor does it explain what statute contains the elements that these "findings" allegedly parallel. Because these assertions lack sufficient support and argument to enable our review, we do not further address them. RAP 10.3(a)(6); see also Holland v. City of Tacoma, 90 Wash.App. 533, 538, 954 P.2d 290 (1998) ("Passing treatment of an issue or lack of reasoned argument is insufficient to merit judicial consideration.") (citing State v. Johnson, 119 Wash.2d 167, 171, 829 P.2d 1082 (1992)).
[100] DOT makes five distinct arguments to support its contention that storm water, not coal tar, caused the Waterway changes in the PAH levels:

(1) according to regional and temporal trend analysis, other areas beside the head of the Waterway that are "well beyond the influence of [the DA-1 Line French drains]," Br. of Appellant at 33, experienced a rise in PAH levels during the same periods of time that the head of the Waterway experienced a rise in sediment PAH levels;
(2) the PAHs were not sufficiently "weathered" to indicate contamination from the DA-1 Line French drains, Br. of Appellant at 35;
(3) the ratios of fluoranthrene to pyrene found in samples from the Waterway taken after the installation of the DA-1 Line French drains are inconsistent with coal tar contamination from the DA-1 Line French drains;
(4) a 2000 report from the Utilities' expert, Dalton, stated that releases from the DA-1 Line French drains did not "substantially impact[]" the Waterway sediment quality and "stormwater discharge is a primary source of [Waterway] sediment contamination," Br. of Appellant at 38 (emphasis omitted) (quoting Ex. 835 at 5); and
(5) "[t]he [trial] court found the testimony of [DOT's] expert, Helder Costa, to be credible and discounted the testimony of Utilities' expert [Dalton] as being in conflict with [Dalton's] earlier reports." Br. of Appellant at 31. All five of these arguments fail.
[101] 9 VRP at 1294, 1297.
[102] 9 VRP at 1253-54.
[103] 9 VRP at 1265.
[104] 9 VRP at 1288 (emphasis added).
[105] 9 VRP at 1288 (emphasis added).
[106] Furthermore, as the trial court noted, although Dalton's testimony during trial was "a change from [his] opinion in 1999," CP at 1936, his 1999 report stated only that (1) the DA-1 Line French drain releases did not "substantially impact[ ]," 9 VRP at 534, the Waterway and (2) that storm water was the "primary"  but not exclusive  "source of sediment contamination." Ex. 835 at 6.
[107] The Utilities also assert on appeal that a temporary retention pond that DOT built as part of SR-509 discharged oil into the Waterway. But the trial court rejected this claim and the Utilities did not cross-appeal this ruling. Therefore, they cannot assert this claim to counter DOT's arguments on appeal. RAP 2.5(a).
[108] 5 VRP at 694-95.
[109] 5 VRP at 695.
[110] Dean Moberg is a former 30-year DOT employee and current employee of the Federal Highway Administration.
[111] CP at 1112.
[112] Lobdell v. Sugar `N Spice, Inc., 33 Wash.App. 881, 887, 658 P.2d 1267 (1983).
[113] In light of this holding, we need not address the Utilities' definition of "facility" and their related alternative theories of DOT liability.
[114] Because our legislature modeled the MTCA on the federal analogue, CERCLA, federal cases interpreting similar statutory provisions are persuasive authority. See Asarco, Inc. v. Dep't of Ecology, 145 Wash.2d 750, 754, 43 P.3d 471 (2002); see also Taliesen, 135 Wash.App. at 127, 144 P.3d 1185.
[115] ___ U.S. ___, 129 S.Ct. 1870, 173 L.Ed.2d 812 (2009).
[116] DOT also argues that the trial court erred in denying DOT's motion to reconsider when the United States Supreme Court issued its decision in Burlington Northern. Br. of Appellant at 7. We review a trial court's ruling on a motion to reconsider for an abuse of discretion. Meridian Minerals Co. v. King County, 61 Wash.App. 195, 203, 810 P.2d 31 (internal quotation marks omitted), review denied, 117 Wash.2d 1017, 818 P.2d 1099 (1991). Because, as we note above, Burlington Northern does not undermine the trial court's analysis, we hold that the trial court did not abuse its discretion in denying DOT's motion to reconsider.

DOT also contends that it is precluded from liability for releases of hazardous substances associated with the SR-509 construction because it qualifies for the "utmost care" exception to liability under RCW 70.105D.040(3)(a)(iii). Br. of Appellant at 30. Because DOT raises this argument for the first time on appeal, in violation of RAP 2.5(a), we do not reach this issue. "The appellate court may refuse to review any claim of error which was not raised in the trial court." RAP 2.5(a).
[117] See also Modern Sewer Corp. v. Nelson Distrib., Inc., 125 Wash.App. 564, 571-72, 109 P.3d 11 (2005) ("[Defendant's] claim that the term `disposal' necessarily includes some element of intent is incorrect."), review denied, 155 Wash.2d 1013, 122 P.3d 186 (2005) (emphasis added).
[118] DOT further contends that the trial court improperly awarded contribution costs based on a "bare showing of [DOT's] liability." Br. of Appellant at 46.
[119] The parties disagree about who bears the burden of proving (or disproving) the Utilities' entitlement to equitable contribution. This issue, however, is academic in light of our holding that the trial court here did not abuse its discretion in allocating contribution for remediation costs.
[120] Under this provision, parties may also recover reasonable attorney fees and expenses. RCW 70.105D.080.
[121] See n. 88 supra. After determining which parties are liable under CERCLA, federal trial courts look to these Gore Factors to determine the proper amount of damages to allocate to those parties. ENSCO, 969 F.2d at 508 (citing United States v. A & F Materials Co., Inc., 578 F.Supp. 1249, 1256 (S.D.Ill.1984)).
[122] See Dash Point, 86 Wash.App. at 607, 937 P.2d 1148 ("In deciding the allocation issue under the MTCA, the trial court applies `equitable factors it deem[s] appropriate' . . . [including] the cause of the contamination, the defendant's relationship to the contamination, as well as other pertinent discretionary factors.") (quoting Car Wash Enter., Inc. v. Kampanos, 74 Wash.App. 537, 548, 874 P.2d 868 (1994)).
[123] Br. of Appellant at 44-45.
[124] A trial court abuses its discretion when its decision is manifestly unreasonable, is exercised for untenable reasons, or is based on untenable grounds. Edwards v. Le Duc, 157 Wash.App. 455, 459, 238 P.3d 1187 (2010) (citation omitted), review denied, 170 Wash.2d 1024, 249 P.3d 623 (2011).
[125] These holdings and rationales do not mean that a trial court may never consider the quantity of hazardous substances a party has released. As we recognized in Seattle City Light, these considerations may be relevant to apportioning costs; but "[i]n many cases (if not most), it is extremely difficult to dissect the waste and associated cleanup costs." Seattle City Light, 98 Wash.App. at 175-76, 989 P.2d 1164 (footnote omitted). Here, for example, the trial court noted, "[T]he testimony of [the expert witnesses] illustrates the difficulty in distinguishing various releases of hazardous substances into the Waterway." CP at 1837.

Accordingly, trial courts are entitled to disregard the quantity and toxicity of a party's release of hazardous substances when apportioning costs, provided that the trial court considers other aspects of the party's involvement (such as the frequently-used Gore Factors). See Dash Point, 86 Wash.App. at 607, 937 P.2d 1148 ("The MTCA specifically grants discretion to the trial court to base recovery on such equitable factors as it considers appropriate.") (footnote omitted).
[126] CP at 1838.
[127] CP at 1835.
[128] Br. of Appellant at 49.
[129] CP at 1832 (FF C.11).
[130] CP at 1835 (FF H.4).
[131] CP at 1832 (FF C.15).
[132] CP at 1832 (FF C.12).
[133] 5 VRP at 663.
[134] 5 VRP at 746.
[135] 5 VRP at 699.
[136] 5 VRP at 754.
[137] CP at 1832 (FF C.12).
[138] DOT cites Basic Mgmt., Inc. v. United States, 569 F.Supp.2d 1106 (D.Nev.2008), and Vine Street, LLC v. Keeling, 460 F.Supp.2d 728 (E.D.Tex.2006), to argue that the Utilities are prohibited from recovering contribution costs from DOT because the combined third party offsets received by the Utilities and their assignors surpass the excess costs of the Utilities and the assignors. The court in Basic Mgmt. held that "[e]quity and common sense ... dictate that Plaintiffs [in CERCLA] cannot recover the remediation costs paid for by their insurance policies," Basic Mgmt., 569 F.Supp.2d at 1125; the court in Vine Street held that "[o]nce the CERCLA claimant obtains complete recovery from one or more responsible parties, that claimant cannot obtain additional recovery ... because this would create impermissible double recovery." Vine Street, 460 F.Supp.2d at 765. Nothing in the record indicates that the trial court here departed from these rulings. In other words, the record does not show that the Utilities sought or the trial court ordered DOT to contribute remediation costs to the Utilities for costs paid by any insurance companies.
[139] Despite the absence of this requirement, the trial court found that the Utilities themselves had incurred $15.4 million in cleanup costs and that the Utilities and their assignors had "incurred [a total of] $116,153,162 in investigation and remediation costs on the Waterway." CP at 1835. DOT does not challenge these figures. DOT's argumentthat the trial court erred by awarding the Utilities 2 percent of all future costs incurred by either the Utilities or Tacoma because "[Tacoma] could not assign to the Utilities any more than [Tacoma] had"fails for the same reason. Br. of Appellant at 51.
[140] CP at 1842-43.
[141] The reimbursements that Tacoma received from its insurers are relevant to the amount of the Utilities' recovery because Tacoma assigned to the Utilities its right to seek recovery from other liable third parties.
[142] 2 VRP at 209.
[143] 2 VRP at 221.
[144] The record before the trial court also included a list of "current major sites [Puget Sound Energy] is investigating, monitoring, or remediating." CP at 1748.
[145] CP at 2335.